63 So.2d 258 (1953)
EMBREY et al.
v.
SOUTHERN GAS & ELECTRIC CORP. et al.
Supreme Court of Florida, Division A.
February 13, 1953.
Rehearing Denied March 9, 1953.
*259 Thos. W. Butler, Francis C. Millican and Paul M. Souder, Sarasota, for appellants.
Williams, Dart & Bell and Early & Early, Sarasota, for appellees.
SEBRING, Justice.
Laura M. Embrey was injured from an explosion of fuel gas when she attempted to light a gas space heater that had been *260 recently installed in her residence by Southern Gas and Electric Corporation. Subsequently, she died from the injuries she had suffered. Her executor sued E.H. Baker, a dealer in electric appliances, and Southern Gas and Electric Corporation, the corporation that had furnished the gas fuel, to recover damages for their allegedly negligent conduct in creating the condition that brought about the explosion. Later, Sentz and Marshall, two of Baker's employees, were added to the suit as parties defendant.
The negligence alleged to have been committed by Baker was that upon an occasion several months prior to the explosion he, Baker, acting through his employees Sentz and Marshall, had replaced a gas cook stove in the Embrey residence with an electric range; that in making such replacement he had disconnected the cook stove from the gas line, had bent the gas line back up against the wall so that it was hidden from view, and then had departed from the premises without capping the connection. The negligence charged against Sentz and Marshall was their failure to cap the connection when they installed the electric range.
The alleged negligence of the gas company was that when it had installed the gas space heater in the residence, several months after the gas cook stove had been removed from the premises, it had failed to discover the uncapped connection in the kitchen before turning on the gas at the meter.
Being admittedly unable to prove the essential allegations of his complaint by any other method, the executor took the depositions of the gas company's employees who had serviced the gas space heater, and the depositions of Sentz and Marshall, the defendants who had installed the electric range, in an effort to establish what had happened. When the depositions were taken, the plaintiff questioned the defendant, Sentz, at length concerning the circumstances under which he had taken the electric range to the Embrey residence some weeks prior to the explosion, and what he had done when he got there.
The precise questions and answers which point up the issue raised here on this appeal appear in the depositions as follows:
"Q. When you arrived at the house, did you take the electric stove in right away? A. No * * * about twenty minutes later.
"Q. Why didn't you take in the electric stove at the time you first arrived? A. I went to the house to talk to Miss Embrey, and the gas range wasn't disconnected, so I couldn't take it in at that time. There wasn't room for the electric stove and the gas stove in the kitchen both at the same time.
"Q. When you found the gas stove connected up, what did you do? A. I told Miss Embrey that it was supposed to be disconnected and I didn't have the tools to properly disconnect it.
"Q. You arrived and found the gas stove connected up and upon learning that fact did you disconnect the gas stove? A. Yes. * * *
"Q. At the time you disconnected the gas range, what did you do? Did you do anything to the gas pipe connecting the meter and the gas range? A. No.
"Q. You didn't cap it at all? A. No.
"Q. Did you bend it in any direction? A. Not as far as I can remember. No more than it would have to bend it in disconnecting it and moving it to one side to get the other range in. * * *
"Q. How long did it take you to complete the installation, the whole installation at the Embrey house? A. I would say from an hour to an hour and thirty minutes.
"Q. At the time you left, was the gas pipe uncapped? A. Yes."
When the plaintiff had completed this direct examination, the following questions were directed to the witness by defense counsel:
"Q. Mr. Sentz, just why did you disconnect that gas stove? A. At *261 Miss Embrey's request. * * * It was supposed to have been disconnected when I delivered the electric range. All I was supposed to do was pick it up. The gas stove was still connected when I arrived and I told Miss Embrey it should have been disconnected, and she asked me if I could disconnect it and I told her I wasn't supposed to and didn't have the proper tools to take care of it, and she insisted that I disconnect it, so I did.
"Q. When she insisted that you disconnect it, did she know that you were unable to cap or plug the gas pipe? A. Yes, I told her that I didn't have a cap for it and she would have to call the power company and have the pipe capped * * * before the gas was turned back on at the meter.
"Q. And after you informed her you were unable to cap the pipe did she still insist you disconnect it? A. Yes. * * * I told her she would have to have the pipe capped before the gas was turned on. In fact, I told her there was a piece of copper pipe fastened on to a piece of galvanized pipe and there was a lot of copper pipe lying in the back, and that it shouldn't be capped but it should be taken loose from the galvanized pipe and capped. * * *
"Q. Did you tell her it should be done immediately? A. Yes, that it should be done immediately.
"Q. Did she indicate whether or not she was going to do so? A. She said she would."
When the defendant Marshall was placed under oath, he was asked by the plaintiff the following questions, among others:
"Q. Did you see any pipe around there that looked like it might have been the supply pipe for the gas stove? A. You mean running against the wall. There was a pipe there.
"Q. What shape was it in? A. Bent straight up. * * *
"Q. When you left there, in what position was that pipe the last time you saw it? A. The last time I saw it, it was bent up. It was bent straight up between the stove and the bannister that ran along the hot water tank.
"Q. Did you notice the end of that gas pipe, the loose end? A. Yes, sir.
"Q. What condition was it in? A. It was open * * * no connection on it."
On cross-examination the witness was asked by defense counsel whether he had heard Mr. Sentz and Miss Embrey talking about the installation of the electric range. Upon answering that he had, he was asked the following questions and gave the following answers:
"Q. What did they say about the gas stove? A. She asked him could he disconnect the gas stove for her.
"Q. What did he say to that? A. He said he didn't have the tools and he wasn't supposed to do that.
"Q. And what did she say? A. She kept after him, and asked him questions about the gas stove.
"Q. When you say she kept after him, you mean to do what? A. To do the job of disconnecting the stove.
"Q. Was the stove disconnected for her or Mr. Baker? A. For her.
"Q. At her request? A. Yes, sir.
"Q. State whether or not you heard Mr. Sentz say he was not equipped to do it? A. Yes, sir. That's right.
"Q. Did you hear any conversation as to who was the proper person to disconnect the gas stove? A. He told her the proper person was the gas man or a plumber.
"Q. Just before Mr. Sentz left the house, did you hear any further conversation with this woman? A. Yes, sir. He told her several times to call the gas company right away and have the gas line capped up.
"Q. Did he tell her the gas pipe was uncapped? A. Yes, sir."
Whitlow, the employee of the gas company who installed and connected the gas space heater in the living room of the *262 Embrey residence several months after the electric range had been placed in the kitchen, was then called by plaintiff's counsel and interrogated at length concerning precisely what had happened during the time he and Hammond had been on the premises installing the space heater. After this direct interrogation he was cross-examined by defense counsel as follows:
"Q. Did either one of these ladies request you to check any other appliances or pipe? A. No, sir.
"Q. Did they make such a request of Mr. Hammond in your presence or where you could hear? A. They told him they didn't have anything else to check, that everything was electric."
The employee Hammond was likewise examined by plaintiff's counsel and testified on direct examination that he had made no inspection of the premises other than to ask Miss Embrey what other gas appliances she had, and that he had not seen any gas appliances that would require gas fuel, or any gas pipes that would have suggested the need for an inspection. He testified, also, that before leaving the premises he and Whitlow had both checked the line leading from the meter to the space heater and that the tests did not reveal any evidence of gas escaping from an uncapped connection.
On cross-examination by defense counsel the following occurred:
"Q. When you asked the lady whom you understood to be Miss Embrey what else she had, what did she say? A. She said everything was electric.
"Q. Was the reason for asking what they had so that you could check it? A. Yes, that is the customary habit, to ask the people what other appliances they have in the house.
"Q. And when she told you everything else was electric, is that the reason you didn't go in the kitchen to check? A. Yes, sir.
"Q. You did look in enough to see that there was an electric stove? A. Yes, sir."
After these depositions had been taken, the defendants filed a motion for the entry of a summary final judgment in their favor upon the ground that as shown by the evidence developed by the depositions no facts existed to establish liability on the part of either of the defendants, and hence that the defendants were entitled to a judgment in their favor as a matter of law. At the hearing on the motion, the plaintiff objected to any consideration by the trial court of that portion of the cross-examination relating or pertaining to conversations between the witnesses and the decedent, on the ground that the substance of such conversations had been developed for the first time on the cross-examination of the witnesses, and hence was inadmissible as against the executor of such deceased person, under Section 90.05, Florida Statutes 1951, F.S.A., commonly known as the dead man's statute. In connection with this objection, the plaintiff contended that if this evidence were excluded, as legally it should be, the facts developed by the remaining portions of the depositions were sufficient to show negligence on the part of the defendants, at least prima facie, and hence were sufficient to present a case that should be passed on by a jury and not concluded by the entry of a summary final judgment as a matter of law.
The trial judge denied the objections, entered a summary final judgment, and this appeal followed.
We find no error in the ruling of which the plaintiff complains. Being unable to prove his case by any other method, the plaintiff elected to take the sworn depositions of these parties in an attempt to establish his case. When he required them to testify under oath concerning what had transpired, such legally competent evidence as was adduced from them was proper to be considered by the trial judge on the summary judgment proceeding which involved the fundamental question whether there existed any genuine material issue to be tried.
Though it cannot be doubted that the cross-examination of a witness should always be relative to the subject of the main inquiry, it is equally plain that it should not be limited or confined to the identical details testified in chief, but should extend to its entire subject matter, and all matter that may modify, supplement, contradict, *263 rebut or make clearer the facts testified to in chief by the witness on cross-examination. See 58 Am.Jur., Witnesses, Section 632. The existence of a "dead man's statute" does not place any limitation on the legitimate scope of cross-examination, as distinguished from the situation where a party is called to the stand to testify on his own behalf on direct examination. A party for whose benefit or protection the disqualification is erected, by calling and examining as a witness one who is incompetent to testify concerning transactions or conversations with the deceased, waives the incompetency of the witness with respect to matters concerning which he is examined and renders him competent as a witness against the examining party as to such matters. "If the incompetency of the witness exists only where a personal transaction with the deceased is involved, his examination as to such a transaction is a waiver of the incompetency in respect thereto, and entitles him to bring out not merely that part concerning which he was first interrogated; but all the facts regarding the transaction." 58 Am.Jur., Witnesses, Section 358.
The appellant tries to evade this rule by contending that when he questioned the witnesses as to the part they played in installing the electric range, and in connecting up the gas space heater, they were being questioned only as to an "act," as distinguished from a "conversation or transaction," and hence that there was no waiver of incompetency.
We are unable to follow the logic of this contention. The record shows that upon direct examination by the plaintiff the witnesses testified as to having conversations with Miss Embrey which formed the basis for their dealings with her. The questioning on cross-examination merely elicited from the witnesses the substance of the conversations adverted to on direct examinations and painted the complete picture of the situation without which the evidence would have been but half the truth.
In Cunningham's Administrator v. Speagle, 106 Ky. 278, 50 S.W. 244, 246, involving the admissibility of evidence as to transactions with deceased persons, the following is said as to what constitutes a transaction:
"The term `transaction,' which is used in nearly all the statutes, has not been given any very definite meaning by the courts. Whatever may be done by one person which affects another's rights, and out of which a cause of action may arise, is a transaction. It is a broader term than `contract,' for, while every contract is a transaction, every transaction is not a contract. But the courts have interpreted the term as the justice of each case seemed to demand, rather than by any abstract definition, as will be seen by a few of the decided cases. [3 Jones Ev., Sec. 793]."
To the same effect see the case of Taylor v. Ainsworth, 49 Neb. 696, 68 N.W. 1045, 1047, in which the court states, "In our view, the transaction contemplated by the statute was the entire transaction * *." (Emphasis supplied.)
But we need not turn to foreign jurisdictions in order to settle this question. In Chapin v. Mitchell, 44 Fla. 225, 32 So. 875, 876, the following statement is found:
"Transactions and communications embrace every variety of affairs which can form the subject of negotiation, interviews, or actions between two persons, and include every method by which one person can derive impressions or information from the conduct, condition, or language of another".
See also Holliday v. McKinne, 22 Fla. 153; Knowles v. Boylston, 103 Fla. 20, 137 So. 6.
We see no need for a further elaboration of the question, other than to voice agreement with the views expressed by the highest court of Indiana in a case involving a similar statute:
"The enactment in question is a salutary one, but in its operation the legislative hand is often laid heavily upon the honest suitor, and we do not think that his adversary should be accorded *264 the further advantage of compelling the witness to testify upon points against himself without incurring the burden of rendering him competent generally." Young v. Montgomery, 161 Ind. 68, 67 N.E. 684, 686.
We are of the opinion that the trial judge acted correctly in considering the depositions in their entirety. See anno. Ann.Cas. 1918A, 472, 64 A.L.R. 1148, 107 A.L.R. 482, 159 A.L.R. 411.
When the depositions of the witnesses are so considered, the facts of the record show that decedent by her own action caused the gas pipe to be disconnected and uncapped. Knowing of the uncapped condition she nevertheless failed and neglected to have the pipe capped, as she had assured the employees of the electric appliance company she would do. With foreknowledge of this condition, she allowed the gas company employees, who had no notice or knowledge whatsoever of the condition, to install the space heater and turn on the main line leading from the gas meter into the residence. She prevented, or at least dissuaded, them from making a more thorough investigation of the premises through which they might have discovered the uncapped connection, by assuring them that all of her appliances were fueled with electricity and that there was nothing else in the house to inspect. After the employees left the premises, she sat by for over two hours while the gas was escaping and the disagreeable odor therefrom must have filled the house. In the face of these conditions, of which she was charged with knowledge, she struck the match which caused the explosion and brought about this sad incident. Under these circumstances, we think it must be held that the decedent was the one who solely and proximately caused her own injury by her own negligent conduct, and hence that there was no valid basis for recovery against the defendants.
It follows from the conclusions reached that there was no genuine material issue which required the intervention of a jury, and hence that the trial judge acted properly in entering a summary judgment. The judgment of the lower court should accordingly be affirmed, and it is so ordered.
HOBSON, C.J., and TERRELL and MATHEWS, JJ., concur.