58

MOORE v. GROVES.
No. 70-7955.
Circuit Court, Broward County.
March 1, 1972.

E. T. Hunter, Hollywood, for plaintiff.

William L. Flacks, Hollywood, for defendant.

LAMAR WARREN, Circuit Judge.

*Final judgment:* In this action against the executrix of the estate of the decedent, James William Winning, for an equitable lien, it was alleged that the plaintiff and decedent selected a home which they decided to purchase jointly, but that the decedent wanted it deeded in his name only; that beginning in 1955, she resided with him and provided care for him until his death in 1970; that every month she advanced approximately $140 toward the house payment, utilities and their living expenses, and in addition advanced $3,000 which she had received from her mother's estate; that decedent expressed a desire or willingness that upon his death his

estate would belong to her, and that her services and monies were provided to him relying upon his promise; that he signed an agreement or promise to the effect that the home was a joint ownership, the other half being owned by the plaintiff, and that she relied upon the agreement or promise; that his estate was indebted to her, together with the real property and its contents, but that her claim against the estate had been objected to, whereupon she prayed for an equitable lien.

The answer of the defendant executrix denied the essential allegations of the complaint, admitting that the plaintiff did live meretriciously with the decedent from 1955 to his death, and affirmatively alleged that plaintiff was estopped by virtue of the meretricious relationship; that plaintiff was sharing decedent's home, had the benefit of the same, including food and lodging, and that any contributions she made were for her own use and benefit. The executrix counterclaimed for ejectment, replevin, and money damages for the use and occupation of the property by the counterdefendant, all of which the counterdefendant denied.

During the course of the litigation the defendant executrix took the deposition of the plaintiff, and upon the defendant's use of the same while presenting her motion for summary judgment, the court held that the deposition was admissible in evidence at trial. Embrey v. Southern Gas & Electric Corp., 63 So.2d 258; Bordacs v. Kimmel, Fla., 139 So.2d 506.

The plaintiff testified in her deposition that she met the decedent in 1954 (when she was about 40) and they "rather liked one another and decided to make a go of it"; they started living together when they bought the house, it being with the explanation that he didn't make much salary although they first lived together for a short time in an apartment. She had an income of $140 per month from pensions while she was living with decedent. They looked around, it was a small dwelling, but he said he could pay the payments, and that was when they decided to do what they did. "I was to pay this and he was to pay that. And that's what we did ever since, all those years." He paid for the house. "I sometimes gave him $10 and on this or that or on the other, like the shelves in the living room and the mirror, everything half and half. Sometimes I paid full for things and sometimes he paid fully for things." She had the $140 to live on, "plus a little bit extra I always had." James (the decedent) wanted the house in his name and that was the way they did it. She used her income for groceries and living expenses. James bought most of the furniture to begin with. She also did washing, ironing, cooking and sewing. She prepared the plaintiff's exhibit #3. She got $2,000 from her mother's

estate, who died in April, 1968; and her brother gave her $2,000 one year and $2,000 another year. She got the first $2,000 shortly after her death, she would say in 1968. From the first $2,000 she bought different things with it, and she bought a used car and had a lot of expense on that, and she put $1,500 of it in the bank; she bought sheets and other things in the house and bought the car as well, which cost about $1,000, and she had a lot of trouble with it and that cost more and more. That took care of the first $2,000. The next $2,000 she got somewhere around June of 1969. She put that in the bank. None of this money went into James' account. He was never sick in bed a day until he became ill and died. James was employed, but she had no idea about his salary or anything. She had good meals and good clothing, and maybe two times a year he bought her a dress. They both paid for entertainment. From 1954 until his death she was living with him, having her food, lodging, clothing, cars, and entertainment, but they had inexpensive entertainment. They went out to eat on Sundays, for which they both paid. They never married; there was no reason why she wouldn't marry him, other than she thought he was too much taken up with his relatives. She was always second in everything, he more or less belonged to them. She paid her dog's upkeep; they both paid the vet. James signed plaintiff's exhibit #3; nobody else was present.

At the trial the defendant executrix, who was called as an adverse witness, and who was decedent's aunt and employer, testified that the decedent's salary was around $200 a month, and that the mortgage payments on his house were $54 at first, then $57. She also testified that the letter dated December 12, 1960, plaintiff's exhibit #1, looked like his handwriting and signature.

It was stipulated between counsel that the house was worth about $17,000 and the furniture approximately $500. It was further stipulated that it was decedent's signature on exhibit #3.

The plaintiff testified at the trial that she spent her money for food; around $100 a month at first went into the care and maintenance of the relationship, and that increased until all of her money went into the home, and other small amounts, $25 to $50. She used her money for the household expenses. She put her mother's funds — she thought she had about $3,000 — into the home from time to time.

She acted like a housekeeper; she washed, cooked and ironed every day. She worked around the house all day. She took care of the lawn, planted things, but he mowed the lawn. She left one time for about 3 months to visit her mother. Only the two of them

were present at the time exhibit #3 was signed. She drew it up, and that was his signature.

On cross examination she stated that she received $3,000 from her mother and it all went into her bank account. At the decedent's death she didn't know how much was in the bank account. She received her mother's funds in sums of $2,000, received that much three times. Before his death, she didn't remember, but she must have received $2,000 before his death, and she put it in her bank account. Of that $2,000, there was none left, because she had expenses to meet. She bought another car shortly after he died. The $2,000 went for groceries, she bought all of the groceries, except he brought home a little. She bought all the supplies; she did not know on what else she spent it, just needed things; there were incidentals like a new toilet seat, repair of screens, and she purchased different plants at nurseries.

The plaintiff relies on the case of Tonneman v. Tuszynski, 191 So. 18. That case involved an elderly woman and a young man. A friendship sprang up between the two which resulted in an agreement whereby she would give up her boarding house and devote her entire time as housekeeper for the defendant. She advanced him money, kept house, cooked and laundered for him, at no time demanding money or compensation for her labor or services, always relying upon a contract or agreement to the effect that the defendant would take care of her as long as she lived. The defendant married, and plaintiff, when she was 78 years old, penniless, without relatives and friends, was forced out. The court found that she was entitled to an equitable lien for money advanced and for labor and services performed, based upon the agreement or contract to support and maintain her the remainder of her life. In the situation before the court there was no such contract. The parties in her words simply met and "we rather liked one another and decided to make a go of it." Here the parties pooled their income and shared living expenses for mutual convenience and economic expediency for some fifteen years, he working at his job and she keeping house.

As to the $3,000 plaintiff alleged she advanced, in her deposition she testified she received $2,000 from her mother's estate sometime in 1968, her mother having died in April of that year, or between one and two years before James died. Of this $2,000, $1,000 was used for a car, with which she had a lot of trouble and expense, and she bought sheets and other things in the house. At the trial she testified she received the $2,000 before James' death, however, she testified it went for groceries.

. She received another $2,000, according to her deposition, sometime around June, 1969, or about eight months before James' death, which she put in her bank account. Upon inquiry as to whether she spent any of that money, she stated, "Well, yes, you know how living expenses have gone up and now I have, because with James not there, I have the yard to pay for and this and that to pay for and I had some trouble with the plumbing, I had that to pay for." At the trial she testified she bought another car shortly after he died.

In view of the indefinite and inconclusive nature of the plaintiff's testimony in proof of the allegation that she advanced $3,000, the court finds that any funds she did contribute from her mother's estate were nominal and as such were in furtherance of her and the decedent's plan of sharing living expenses from their separate incomes.

There was received in evidence as plaintiff's exhibit #3, a handwritten document, prepared by plaintiff and signed by James Winning, dated April 1, 1964, nearly six years before his death, in which it is stated, "I, James William Winning, do hereby set my hand this 1st day of April, 1964 that the property — house, lot and contents, located at 2134 Funston St., Hollywood, Florida, is a joint ownership — the other half owned by Lillian Sale Moore who has faithfully paid *her* share for a number of years. *James Winning* Signed this 1st day of April, 1964".

Suffice it to say that James never conveyed to her any interest in the property. They continued to live together several years more after he signed the document. He wanted the house in his name in the beginning, he paid for it, and he bought most of the initial furniture. It is inescapable from all of the evidence he did not intend to part with any interest in the property.

The court finds no basis for an equitable lien in favor of the plaintiff; and further finds that the counterplaintiff is entitled to possession of the real property and such personal property as the decedent purchased at the inception of the relationship, it appearing that further proceedings may be necessary to determine the ownership of any other personal property; that the counterplaintiff is not entitled to damages for the use and occupation of the property by the plaintiff.

It is therefore adjudged that the complaint be and the same is hereby dismissed, at the cost of the plaintiff, that the counterplaintiff is entitled to possession of the real property and such personal property located thereon as decedent originally purchased, and that the counterplaintiff shall recover no damages for the use and occupation of the property by the plaintiff.