431 So.2d 658 (1983)
Marcella Brosilow HULSH and Fred Brosilow, Appellants,
v.
Rea R. HULSH, Appellee.
No. 81-1299.
District Court of Appeal of Florida, Third District.
May 3, 1983.
Rehearing Denied June 7, 1983.
*660 Lapidus & Stettin, Herbert Stettin and Robert P. Frankel, Miami, for appellants.
Louis Schwarzkopf, Miami Beach, Horton, Perse & Ginsberg and Mallory H. Horton, Miami, for appellee.
Before HENDRY, DANIEL S. PEARSON and FERGUSON, JJ.
DANIEL S. PEARSON, Judge.
The issues in this case are (1) whether the language of a post-will antenuptial agreement between the decedent and the widow was effective to waive the widow's right to take under the will; and, if so, does the widow's disqualification affect the rights of her son to take under the will; (2) whether the widow was barred by the Deadman's Statute from showing that the antenuptial agreement was destroyed by the decedent and her; and (3) whether a provision in the will giving the widow and decedent's mother life estates in a residuary trust was so incompatible with a later provision giving the decedent's stepson (the widow's son) the corpus of the residuary trust when he attains a certain age as to justify the nullification of the latter provision.
The essential facts are these. In 1971, when Sheldon Hulsh executed the will in question, his close friend was Marcella Brosilow, a woman he later married. Sheldon's will made certain specific bequests, following which it established a testamentary trust in the residuary. The trust was to be distributed in accordance with the following numbered paragraphs of Article V D):
"1. If my mother, REA R. HULSH, survives me, then during her lifetime fifty (50%) percent of the net income from the residuary trust shall be paid to or applied for her benefit in convenient installments, but not less frequently than quarterly and the remaining fifty (50%) percent of the net income from the residuary trust shall be paid to MARCELLA BROSILOW or applied for her benefit in convenient installments but not less frequently than quarterly.
"2. If my mother, REA R. HULSH, shall not survive me, but my father, BENJAMIN M. HULSH, shall survive me, then, in lieu of the provisions set forth in sub-paragraph D)1. above, I desire and direct that during the lifetime of my father, twenty (20%) percent of all of the net income from the residuary trust be paid to or applied for his benefit in convenient installments but not less frequently than quarterly and the remaining eighty (80%) percent of the net income from the Residuary Trust shall be paid to MARCELLA BROSILOW or applied for her benefit in convenient installments but not less frequently than quarterly, if she survives me.
"3. If MARCELLA BROSILOW shall survive me and, if neither my father nor my mother shall survive me, then I desire and direct that during her lifetime, MARCELLA BROSILOW shall receive all the *661 net income from the Residuary Trust which shall be paid to or applied for her benefit in convenient installments but not less frequently than quarterly and, upon the death of MARCELLA BROSILOW, my Trustee shall pay the net income from the Residuary Trust in convenient installments to or for the benefit of FRED BROSILOW, the son of MARCELLA BROSILOW, until complete distribution of the Residuary Trust as hereinafter provided, or the death of FRED BROSILOW prior to complete distribution; except as hereinafter provided while FRED BROSILOW is under the age of twenty-one (21) years.
"4. When FRED BROSILOW reaches the age of thirty (30) years, my Trustee shall distribute to him outright the corpus of the Residuary Trust and this Trust shall thereafter terminate. In the event that FRED BROSILOW shall not attain the age of thirty (30) years and in the further event that MARCELLA BROSILOW, my mother and my father shall not survive me, then I direct that my trustee shall distribute to my brother, CLAYTON HULSH, the principal of this Trust.
"5. If any portion of the Residuary Trust becomes distributable to FRED BROSILOW before he has attained the age of twenty-one (21) years, then such portion shall immediately vest in him, but my Trustee shall retain possession of such portion while FRED BROSILOW is under the age of twenty-one (21) years. In the meantime, my Trustee shall use or expend and apply so much of the income of such portion as my Trustee deems necessary or desirable for the medical care, education and support in reasonable comfort of FRED BROSILOW, adding any income not so used to principal at the end of each calendar year. My Trustee shall have as to each retained share all the powers of investment and administration had with respect to the Residuary Trust generally."
In 1976, Sheldon married Marcella Brosilow. Three days before the marriage they executed an antenuptial agreement, which provided in pertinent part that it was being made:
"In consideration of the premises and of the marriage, and consideration of each relinquishing any interest each has in the estate of the other, including dower, courtesy [sic], or any statutory shares... ."
and that the parties:
"expressly waive all rights which they might otherwise have or claim under the laws of the State of Florida, or any other jurisdiction, to the property of the other, including any such rights which might be claimed under the laws of dower, courtesy [sic], or the elective share of a spouse, or in any other manner by operation of law, and each hereby releases all marital property rights, including but not limited to homestead rights under the laws of the State of Florida or any other jurisdiction."
Sheldon died in 1980. After his will was admitted to probate, his mother petitioned to determine the beneficiaries of the estate. After a non-jury trial, the lower court found in pertinent part:
"1. That the clear and manifest intent of the Testator, SHELDON D. HULSH, at the time of the execution of his Will under date of December 17th, 1971, was to create life income estates for the benefit of his mother, REA R. HULSH, and his then friend, MARCELLA BROSILOW.
"2. That Article V (D) Page 7 [see paragraph numbered 4, supra, p. 3] of said Will seeking to cancel, annul and defeat the favored life income estates of REA R. HULSH and MARCELLA BROSILOW at the time FRED BROSILOW reaches the age of thirty years by then distributing outright the trust residuary to him ... is entirely diametrically opposed to and irreconcilable with the said life income bequests and, therefore, is void and should be stricken.
... .
"4. That the resultant failure of the Trust to vest the residuary in a person or persons within lives in being and twenty-one years is a clear violation of the Rule *662 against Perpetuities and consequently of itself voids the entire Trust.
"5. That the Antenuptial Agreement of May 13th, 1976 between the deceased, SHELDON D. HULSH, and MARCELLA BROSILOW admitted in evidence as Petitioner's Exhibit 1 is valid and binding upon said MARCELLA BROSILOW HULSH, bars her from taking under the Will and, therefore, any and all bequests to her under said Will are void and of no effect and should be stricken accordingly; ..."
The ensuing judgment of the trial court nullified all bequests to Marcella Brosilow Hulsh and Fred Brosilow, declared the residuary trust void, and awarded the residuary estate to the decedent's mother as the sole surviving ascendant beneficiary under the laws of descent and distribution. Marcella and Fred have appealed.

I.

The Antenuptial Agreement
We have no difficulty in deciding that the language of the antenuptial agreement was sufficient to waive Marcella's rights to take under the provisions of Sheldon Hulsh's will.[1] Section 731.005(1), Florida Statutes (1975) (currently § 732.702(1), Fla. Stat. (1981)), provides:
"The right of election of a surviving spouse and the rights of the surviving spouse to homestead, exempt property, and family allowance, or any of them, may be waived, wholly or partly, before or after marriage, by a written contract, agreement, or waiver signed by the waiving party. Unless it provides to the contrary, a waiver of `all rights,' or equivalent language, in the property or estate of a present or prospective spouse, or a complete property settlement entered into after, or in anticipation of, separation, dissolution of marriage, or divorce, is a waiver of all rights to elective share, homestead property, exempt property, and family allowance by each spouse in the property of the other and a renunciation by each of all benefits that would otherwise pass to either from the other by intestate succession or by the provisions of any will executed before the waiver or property settlement."
The antenuptial agreement explicitly waives "all rights" to the "property of the other," which waiver, by virtue of the statute, constitutes "a renunciation by each of all benefits that would otherwise pass to either from the other ... by the provisions of any will executed before the waiver... ." The agreement contains as well the equivalent language "relinquishing any interest each has in the estate of the other," and has no provision which diminishes the breadth of the waiver. Thus, if still in existence at Sheldon's death, the agreement was fully effective to waive Marcella's rights.[2]

II.

Deadman's Statute
During the trial, Marcella attempted to prove that the antenuptial agreement had been rescinded. However, the trial court refused to admit the testimony of Marcella that on November 8, 1978, she and the decedent went to Sheldon's lawyer's office, obtained a bond copy original of the antenuptial agreement and tore it up. The heart of the proffered testimony was this:
"Q. [By Marcella's lawyer] Did there come a time when you accompanied your husband to [the lawyer's] office for the purpose of obtaining the original antenuptial agreement?
"A. Yes, sir.

*663 "Q. Had there been discussions between you and your husband before going to [the lawyer's] office on why you wanted to do that?
"A. Yes, sir.
"Q. What was the reason that you wanted to go and get the agreement?
"A. We talked about the agreement, and I felt we were separated at the time and I felt that if anything happened to Shelley 
"Q. Meaning Mr. Hulsh?
"A. Yes, Mr. Hulsh. I am sorry. Shelley.
... .
"THE WITNESS: [Continuing] That there would be no provision for me since I was totally dependent upon him for support.
"Q. Did you know of the will at that time?
"A. No, no.
"Q. Was there any finding reached between you and your husband concerning what would happen to the antenuptial agreement when you went to [the lawyer's] office?
"A. Yes.
"Q. What?
"A. Shelley said that he felt that it wasn't fair and that we would get the agreement and destroy it.
"Q. When you got to [the lawyer's] office, did you meet [the lawyer] there?
"A. No.
"Q. Did you get the original of the antenuptial agreement?
"A. Yes. The receptionist handed that to Mr. Hulsh.
"Q. Were you standing nearby?
"A. Yes, I was there.
"Q. What happened to it, then?
"A. Sheldon looked at it, read through it. He handed it to me to let me look through it to make certain that it was the original.
"There was a receipt that he signed that the judge has there.
... .
"And, then, he signed the yellow receipt that the judge has there.
... .
"And he handed me the yellow receipt.
"I put it in my purse. And, then, Shelley took the agreement, the paper, and he tore it in half and tore it in half again, and he handed it to me.
"Q. What did you do with it when he handed it to you?
"A. I tore it in smaller pieces. I looked around for a wastepaper basket.
"There was none in the reception room, and I leaped [sic] into the window where the receptionist was and I asked her to please, throw the paper away.
"And she threw it into the wastepaper basket."
The trial court's ruling that the foregoing testimony was inadmissible was based on Section 90.602, Florida Statutes (1979), commonly known as the "Deadman's Statute." The statute provides:
"No person interested in an action ... shall be examined as a witness regarding any oral communication between the interested person and the person who is deceased ... at the time of the examination." Id. § 90.602(1).
At common law, parties and interested persons were disqualified from giving testimony as witnesses because of the belief they were the most likely "to speak falsely." Day v. Stickle, 113 So.2d 559, 560 (Fla. 3d DCA 1959). The Deadman's Statute was enacted "to remove the general disqualification," id., that is, to enlarge the capacity to testify. See Madison v. Robinson, 96 Fla. 321, 116 So. 31 (1928).
In its present form, as part of the evidence code, the Deadman's Statute disqualifies an interested person from testifying only as to "any oral communication" with the decedent. The predecessor statute, before its revision in 1976, barred testimony by an interested person as to "any transaction and communication" with the decedent, § 90.05, Fla. Stat. (1977) (effective date July 1, 1978). See § 90.602, Fla. Stat. Ann. (1979), Law Revision Council Note  1976 ("Existing Fla. Stat. § 90.05 is substantially *664 restated and the same class of persons [the interested party] is protected. However, the section is applicable only to `oral communications' and not to `transactions' because of problems that have arisen therewith." Id.). Thus, under the former statute, testimony concerning "every variety of affairs which could form the subject of negotiation, interviews, or actions between two persons and every method by which one person could derive impressions or information from the conduct, condition or language of another" was excluded. Embrey v. Southern Gas & Electric Corp., 63 So.2d 258, 263 (Fla. 1953) (quoting from Chapin v. Mitchell, 44 Fla. 225, 32 So. 875, 876 (1902)). It is apparent, however, that the present version of the Deadman's Statute excludes only oral communications, and the "interested person" is competent to testify concerning written communications or transactions that such person had with the decedent. 5 West's Florida Practice, Florida Evidence § 602.1 (1977). See also Day v. Stickle, 113 So.2d 559 (holding that the Deadman's Statute should not be extended by judicial construction to cases not clearly within its terms).
Therefore, we think it clear that those portions of the proferred testimony that refer either explicitly or implicitly to conversations between Marcella and the decedent are barred by the Deadman's Statute[3]; but that those portions of Marcella's proffered testimony relating the decedent's actions in procuring and tearing up the agreement are not oral communications between her and the decedent and are not barred by the statute.[4]

III.

Construing The Will
The polestar in construing any will is to ascertain the intent of the testator, In re Estate of Johnson, 347 So.2d 785 (Fla. 1st DCA 1977); In re Parker's Estate, 110 So.2d 498 (Fla. 1st DCA 1959); see generally 4 W. Bowe & D. Parker, Page On The Law of Wills § 30.6 (1961 & Supp. 1981-82), from a consideration of the will as a whole. Page On Wills, supra § 30.10. Where the will viewed in its entirety expresses an intent to make a certain disposition, that intent should, where possible, prevail over some isolated clause of the will that appears contrary to the overall intent. Meszaros v. Holsberry, 84 So.2d 565 (Fla. 1956); In re Estate of Ritz, 385 So.2d 1102 (Fla. 5th DCA 1980).
*665 A review of the testamentary plan evidenced by the whole will convinces us that the testator's primary intention was to provide for the complete and final disposition of his property and to leave nothing to be disposed of under the laws of intestacy. Accordingly, we must prefer any reasonable construction which does not do violence to the testator's language to a construction which results in partial intestacy. Koerner v. Borck, 100 So.2d 398 (Fla. 1958); In re Smith, 49 So.2d 337 (Fla. 1950); Page On Wills, supra § 30.11.
As not infrequently happens, the testator, operating under the all-too-human assumption that the younger would survive the older, failed to foresee and provide for the possibility that the opposite might occur. See Page On Wills, supra § 30.11. His failure to provide for an unforeseen contingency, although creating inconsistency between certain provisions of the will, is not fatal.
"While the will of testator is to be construed as an entirety and all provisions therein are to be rendered consistent with each other, it not infrequently happens that the general intent of testator as deduced from the consideration of the will as a whole is at variance with a particular direction of some clause. This conflict of intention usually arises where the testator has not carefully thought out the application of the provisions of his will to all possible states of fact and has not, therefore, foreseen the actual contingency. In such a case, the court while avoiding making a will for a man who did not succeed in making one for himself will nevertheless, if the general intention of the testator is clear, give effect to such intention, disregarding the particular intent of the particular clause. (citations omitted)." 4 W. Bowe & D. Parker, Page On The Law of Wills § 30.11 (1961).
From an examination of the will as a whole, the trial court found  we think correctly  that "the clear and manifest intent of the testator ... was to create life income estates for the benefit of his mother, Rea R. Hulsh, and his then friend, Marcella Brosilow." The trial court was required to keep that intent in mind and attempt to reconcile any apparent inconsistencies rather than, as it did, give effect to one over the other. Meszaros v. Holsberry, 84 So.2d 565; In re Smith's Estate, 75 So.2d 686 (Fla. 1954); Adams v. Vidal, 60 So.2d 545 (Fla. 1952); Rowland v. Miller, 81 Fla. 408, 88 So. 263 (1921); In re Estate of Wood, 226 So.2d 46 (Fla. 2d DCA 1969); Page On Wills, supra § 30.20 at 128.
In our view, harmony between the provision giving life estates to Rea and Marcella and the provisions giving the father twenty per cent upon the death of Rea and giving Fred the trust corpus when he reached the age of thirty was easily attainable and well within the bounds of reason. Utilizing the stated rules of construction, we discern the testator's intent to have been to limit the operation of paragraph 4 of Article V D) by the language contained in the preceding paragraph of the will. See In re Smith's Estate, 75 So.2d at 688-89. A mistaken use of paragraphs will not be permitted to override the testator's intent. See Gardiner v. Pelton, 260 Mass. 577, 157 N.E. 707 (1927). Had paragraphs 4 and 5 restricting Fred's entitlement to the funds depending on his age been set forth as subparagraphs of paragraph 3, the apparent conflict between Fred's receipt of the trust corpus and the life estates to Rea and Marcella would disappear. While it is true, as the trial court found, that the testator intended to create life estates for Rea and Marcella, the testamentary bequest to Fred equally contains the testator's words and cannot be disregarded when its purpose is clear. Read together, paragraphs 1 through 5 of Article V D) manifest an intent that Marcella and Rea are to have equal life estates; that Marcella's interest is to be enlarged to eighty per cent upon Rea's death and one hundred per cent when both Rea and Sheldon's father, Benjamin, are dead; and that Fred is entitled to an interest in the trust only upon the death of Marcella, the extent of which will depend on whether Rea and Benjamin are alive. Thus, Fred takes nothing under the trust until Marcella's death; if Rea is alive at *666 that time, Fred takes fifty per cent; when both Marcella and Rea are dead, but Benjamin is alive, Fred takes eighty per cent; when Marcella, Rea and Benjamin are dead, Fred takes one hundred per cent. However, the nature of Fred's interest, that is, income or corpus, will in all events depend on Fred's age. For example, if upon Marcella's death, Rea is alive and Fred is less than thirty, Fred will be entitled to receive fifty per cent of the net income from the trust until he becomes thirty, at which time he will be entitled to receive fifty per cent of the corpus of the trust, with the entire income from the undistributed fifty per cent of the corpus to be paid to Rea. Similarly, if only Benjamin is alive and Fred is less than thirty, Fred will be entitled to receive eighty per cent of the net income from the trust until he becomes thirty, at which time he will receive eighty per cent of the corpus of the trust, with the entire income from the undistributed twenty per cent of the corpus to be paid to Benjamin.
We have stated that Fred is entitled to an interest in the trust only upon the death of Marcella. However, we hasten to point out the provision for Fred will be activated either by Marcella's death in fact or by the legal equivalent of her death. Thus, if it is ultimately determined that the antenuptial agreement was not mutually rescinded and that, therefore, Marcella's waiver in the agreement disqualifies her from taking under the will, that disqualification is deemed to be the functional equivalent of her death, which will activate the provision for Fred.[5]Cf. LaMontagne v. Hunter, 341 So.2d 1074 (Fla. 2d DCA 1977) (where will made sons of testator's wife contingent beneficiaries in event of her death, divorce between testator and wife "took the wife out of the picture just as surely as would her death," activating the right of the stepsons to take under the will); In re Estate of Fredericks, 311 So.2d 376 (Fla. 2d DCA 1975) (same, except contingent beneficiary was charitable institution).
We hold, therefore, that the trial court erred in concluding that the provisions of the will were irreconcilable and voiding the provision for Fred.[6] It follows from this holding that it is not even arguable that the rule against perpetuities was violated[7] and that such part of the trial court's judgment voiding the entire trust on that ground must also be reversed.
*667 Accordingly, the judgment of the trial court is reversed with directions that the residuary trust established by the decedent's will as reconciled in this opinion remain in full force and effect. The cause is remanded to the trial court for a trial on Marcella Hulsh's claim that the antenuptial agreement was mutually abandoned by her and the decedent. If the trial court finds that the antenuptial agreement was not mutually rescinded, and that, therefore, Marcella is disqualified from taking as if dead, then the provision for Fred will be immediately activated and Fred entitled to take in the manner set forth in this opinion. If the trial court finds that the antenuptial agreement was mutually rescinded, then the provision for Fred will not be activated until Marcella's actual death.
Reversed and remanded with directions.
NOTES
[1] Marcella does not challenge the validity of the agreement. See, e.g., Carnell v. Carnell, 398 So.2d 503 (Fla. 5th DCA 1981) (undue influence recognized as ground to challenge validity of antenuptial agreement); Lutgert v. Lutgert, 338 So.2d 1111 (Fla. 2d DCA 1976) (same).
[2] Just as surely, however, Marcella's waiver of her rights disqualifying her from taking under the will cannot serve to disqualify Fred. The antenuptial agreement does not even purport to waive any of Fred's rights. Moreover, Fred was twenty-one years old at the time of the execution of the agreement.
[3] A wooden application of "oral communication" is no more acceptable in this context than in the context of the hearsay rule. Thus, where the inescapable inference from the witness's testimony is that the decedent made certain statements to the witness, the testimony is an oral communication within the Deadman's Statute as much as when the witness testifies to the actual statements made by the decedent. Cf. Molina v. State, 406 So.2d 57 (Fla. 3d DCA 1981); Postell v. State, 398 So.2d 851 (Fla. 3d DCA 1981) (rule prohibiting hearsay violated notwithstanding that actual statements of declarant not repeated, where nature of statements can be readily inferred).
[4] Because the trial court sustained the appellee's objection to the testimony on the ground that it was barred by the Deadman's Statute, the appellee made no further objection. Merely because testimony is not barred by the Deadman's Statute does not mean that other rules of evidence which might bar its admission are suspended. See Croom v. Noll, 6 Fla. 52, 61 (1855). The Deadman's Statute deals only with the competency of the witness to testify. Joyner v. Bernard, 153 Fla. 372, 14 So.2d 724 (1943). Here, although the witness was not incompetent to testify concerning the decedent's actions or nonverbal conduct, it is clear that such testimony was being offered to prove an assertion on the part of the decedent and is therefore, by definition, hearsay. See § 90.801(1)(a), Fla. Stat. (1981). However, because the testimony that the decedent destroyed the antenuptial agreement was obviously offered to prove the decedent's intent to abandon the agreement, such intent being an issue in the lawsuit, the testimony falls within the state of mind exception to the hearsay rule and is admissible. See § 90.803(3), Fla. Stat. (1981). Of course, Sheldon's destruction of the agreement, if believed, is only a fact from which abandonment may be inferred. See, e.g., McMullen v. McMullen, 185 So.2d 191 (Fla. 2d DCA 1966). Unlike contracts under seal and certain like formal instruments which represent the legal obligation itself, see L. Simpson, Law of Contracts § 206 at 415 (1965), a written antenuptial agreement is merely evidence of the underlying legal obligation, and its destruction does not, ipso facto, terminate the agreement.
[5] Although Marcella's disqualification by waiver is tantamount to her death prior to the death of the testator, which arguably would cause the devise to her to lapse and pass to the other residuary legatee, see § 732.604, Fla. Stat. (1979), Sorrells v. McNally, 89 Fla. 457, 105 So. 106 (1925), our conclusion that the will evinces Sheldon's intent to substitute Fred in Marcella's place in the event that Marcella predeceased Sheldon prevents the lapse from occurring. See § 732.603(2), Fla. Stat. (1979). Had we been unable to reach this conclusion, then the bequest to Marcella would lapse, since she is not a blood relative of the testator, and her descendant would not be protected by the antilapse provision of Section 732.603(1), Florida Statutes (1979). See In re Estate of Skinner, 397 So.2d 1193 (Fla. 4th DCA 1981); Tubbs v. Teeple, 388 So.2d 239 (Fla. 2d DCA 1980).
[6] Appellants agree with the trial court that the provisions were irreconcilable, but assert that the error lies in voiding the bequest to Fred instead of the life estates to Rea and Marcella. If, arguendo, the provisions could not be reconciled by giving full effect to both, then the contention that the bequest to Fred should prevail is defeated by the separate rule of construction that if the effect of a later provision would be to cut down an earlier gift, such effect will not be given to the later provision unless it is as clear and unambiguous as the original provision. See In re Roger's Estate, 180 So.2d 167 (Fla. 2d DCA 1965); Page On Wills, supra § 30.20 at 129. Finally, since the testator's intent could be and was gleaned from the will itself, parol evidence seeking to establish some contrary intent was inadmissible. See In re Block's Estate, 143 Fla. 163, 196 So. 410 (Fla. 1940); Adams v. Vidal, 60 So.2d 545; In re Estate of Lesher, 365 So.2d 815 (Fla. 1st DCA 1979). Although the trial court erroneously admitted parol evidence offered by the appellants, it appears that its ultimate finding, which, sub silentio, accorded such evidence little, if any, weight, was correct. Therefore, appellants will not be heard to say that such evidence was entitled to greater consideration when, in fact, such evidence was not even entitled to admission.
[7] Even were the bequest to Fred void, we would find no violation of the rule against perpetuities. A discussion of our reasons is, however, unnecessary to this opinion.