[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 417 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 418 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 419 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 420 
 On Remand from the Alabama Supreme Court
The appellant, Aaron Evans, was convicted of one count of second-degree criminal possession of a forged instrument, a violation of § 13A-9-6, Ala. Code 1975; seven counts of illegal absentee voting, violations of § 17-10-17, Ala. Code 1975; and seven counts of second-degree forgery, violations of § 13A-9-3, Ala. Code 1975.[1] For the second-degree possession-of-a-forged-instrument conviction, Evans was sentenced to 10 years' imprisonment. That sentence was split, and he was ordered to serve two years' imprisonment, followed by five years' probation. For each of the illegal absentee-voting convictions, he was sentenced to two years' imprisonment. Additionally, for each of the second-degree forgery convictions, he was sentenced to 10 years' imprisonment. These 10-year sentences were split, and for each conviction he was ordered to serve two years' imprisonment, followed by five years' probation. All of the sentences are to run concurrently.
On September 17, 1999, this Court reversed Evans's convictions based on the trial court's granting a challenge for cause that was not authorized by § 12-16-150, Ala. Code 1975. Evans v. State,794 So.2d 405 (Ala.Crim.App. 1999). The Alabama Supreme Court, however, in Evans v. State, 794 So.2d 411 (Ala. 2000), reversed this Court's judgment and remanded the case to this Court to address the remaining issues. *Page 421 
 I.
Evans contends that the state failed to establish a prima facie case of the seven counts of second-degree forgery and of illegal absentee voting. (Part IX of Evans's brief to this Court at p. 11.) Specifically, he argues that the evidence to support the forgery convictions was insufficient because, he claims, the absentee ballot manager was not a "public employee" as that term is defined at § 32-25-1(9), Ala. Code 1975. Additionally, he argues that the evidence to support the illegal-absentee-voting convictions was insufficient because, he claims, there was no evidence that the allegedly illegal absentee votes were cast or counted.
Section 13A-9-3, Ala. Code 1975, states, in pertinent part:
 "(a) A person commits the crime of forgery in the second degree if, with intent to defraud, he falsely makes, completes or alters a written instrument which is or purports to be, or which is calculated to become or to represent if completed:
". . . .
 "(2) A public record, or an instrument filed or required or authorized by law to be filed in a public office or with a public employee."
Section 17-10-17, Ala. Code 1975, states, in pertinent part:
 "(a) Any person who willfully changes an absentee voter's ballot to the extent that it does not reflect the voter's true ballot, any person who willfully votes more than once by absentee in the same election, any person who willfully votes for another voter or falsifies absentee ballot applications or verification documents so as to vote absentee, or any person who solicits, encourages, urges, or otherwise promotes illegal absentee voting, upon conviction, shall be punished by imprisonment in the penitentiary for not less than one nor more than two years, or by a fine of not less than $500.00 nor more than $2,000.00, or by being both fined and imprisoned. Any person who willfully aids any person unlawfully to vote an absentee ballot, any person who knowingly and unlawfully votes an absentee ballot, and any voter who votes both an absentee and a regular ballot at any election shall be similarly punished.
". . . .
 "(c) Nothing in this section shall be construed to impede or inhibit organized legal efforts to encourage voter participation in the election process or to discourage a candidate from encouraging electors to lawfully vote by absentee ballot."
In McElroy v. State, 571 So.2d 353 (Ala.Crim.App. 1990), this Court stated:
 "It is not the province of this court to reweigh the evidence. Walker v. State, 416 So.2d 1083
(Ala.Cr.App. 1982). As a rule, this court will uphold the jury's verdict and the trial judge's decision unless they were palpably contrary to the great weight of the evidence and manifestly wrong. Raines v. State, 428 So.2d 206 (Ala.Cr.App. 1983)."
571 So.2d at 356.
Additionally, in Bozeman v. State, 401 So.2d 167 (Ala.Crim.App. 1981), this Court stated:
 "On review, this Court is to consider the evidence in the light most favorable to the prosecution. McCord v. State, 373 So.2d 1242 (Ala.Cr.App. 1979); Coleman v. State, 37 Ala. App. 406, 69 So.2d 481 (1954). This court must take the evidence favorable to the prosecution as true, and accord to the State all legitimate inferences therefrom. Johnson v. State, 378 So.2d 1173 (Ala. 1979). Circumstantial evidence must be accorded *Page 422 
the same weight as direct evidence when it points to the accused as the guilty party. Locke v. State, 338 So.2d 488
(Ala.Cr.App. 1976). The truthfulness of the testimony was for the triers of fact. May v. State, 335 So.2d 242
(Ala.Cr.App. 1976)."
401 So.2d at 171.
"`The weight and probative value to be given to the evidence, the credibility of the witnesses, the resolution of conflicting testimony, and inferences to be drawn from the evidence are for the jury. . . . A defendant's guilt may be established by circumstantial evidence as well as by direct evidence.'" Robinson v. State, 728 So.2d 650, 654
(Ala.Crim.App. 1997), quoting Smith v. State, 698 So.2d 189, 214
(Ala.Crim.App. 1996).
The record indicates that, in February 1995, a special election was held to elect certain city council members for the City of Greensboro. Carol Townsend, the city clerk, testified that the council appointed her to serve as election manager and as absentee election manager. Townsend stated that, as an absentee election manager, she received applications for absentee ballots, checked each absentee voter's name off a poll list of eligible voters, and mailed out documents necessary to vote by absentee ballot. Testimony indicated that the documents that Townsend sent to the absentee voter were a ballot, an envelope for the marked ballot, and an affidavit envelope.
The record indicates that the following procedure was implemented to vote by absentee ballot. After the absentee voter marked his or her ballot, he placed it in the ballot envelope, which he then sealed. The voter then placed the sealed ballot envelope in the affidavit envelope and sealed that envelope. On one side of the affidavit envelope is an affidavit for the voter to fill out and sign. On the other side of the affidavit envelope is a place for the voter's return address.
Townsend testified that a person voting by absentee ballot may either mail or hand deliver the sealed affidavit envelope containing the voting materials to the absentee election manager's office. Townsend stated that the usual procedure is for the absentee election manager to take the envelopes to the polls on election day and give the sealed envelopes containing the votes to the poll officials.
Townsend stated that approximately a month before the election, someone burglarized her office and stole election supplies, including blank applications for absentee ballots, blank absentee ballots, and blank affidavit envelopes. Additionally, Townsend testified that, a few weeks before the election, Evans came by her office and picked up several absentee ballot application forms.
According to Townsend, approximately three weeks before the election, she noticed that several absentee applications appeared to be written in the same handwriting and that a few applications appeared to list incorrect addresses. Townsend testified that she informed the district attorney of the perceived problem. (R. 194.) Townsend stated that she checked the voter registration cards against the questioned signatures. Additionally, Townsend stated that she sent letters to 81 applicants, informing them that the signatures on their absentee ballot applications did not match the signatures on their voter registration cards, and instructing them to come to her office in person if they needed an absentee ballot. According to Townsend, of the 81 voters, 49 did not respond. Townsend stated that she challenged 17 of the ballots at the polls on election day.
Because Evans was convicted of numerous counts, we will analyze the sufficiency-of-the-evidence *Page 423 
issue as it applies to each victim. Additionally, we note that, although the indictment charged multiple counts of illegal absentee voting with regard to each victim, the trial court consolidated those counts into one offense against each victim.
 A. Rosia Gray
Evans was found guilty of illegal absentee voting regarding the absentee ballot application of Rosia Gray (Counts 1, 2, 3) and criminal possession of a forged instrument, namely Rosia's absentee ballot application (Count 5).
Sharon Gray, Rosia's daughter, testified that in February 1995, Evans brought a few absentee ballot applications to her mother's house. Sharon stated that Rosia was present in the house while Evans visited. According to Sharon, because Rosia was not feeling well, Rosia gave Sharon permission to sign Rosia's absentee ballot application. Additionally, Rosia testified that, because she was recovering from a recent childbirth, she gave Sharon permission to sign the absentee ballot application. Sharon testified that Evans told her that, because her mother was not feeling well and because her mother gave her permission, it was acceptable for her to sign her mother's application. Additionally, Rosia testified that she recognized the handwriting on her absentee ballot application as Sharon's handwriting. Rosia stated that she did not give anyone permission to write down her date of birth on the application, but that it was possible that Sharon had filled in her birthdate information.[2]
Sharon testified that she was unsure, but that it was possible that she had checked a box on the absentee ballot application indicating that Rosia would be out of town on election day. (R. 811.) Rosia stated that she was in town on election day and that she had planned to vote. No testimony indicated that Evans knew that Rosia was going to be in town on election day. Although Rosia stated that she was present in the county on election day, the testimony did not indicate that Rosia or Sharon told Evans that Rosia planned to be in town.
Dr. Richard Roper, a forensic handwriting expert, testified that the three handwritten entries, including the "Rosia Gray" signature, on the application were all written by the same person. Dr. Roper did not indicate who he believed wrote the entries on the application. Additionally, Roper testified that, in his opinion, Evans wrote the return address on the application envelope.
First, we must determine whether the state established a prima facie case of illegal absentee voting.
We recognize that, in Taylor v. Cox, 710 So.2d 406, 408 (Ala. 1998), the Alabama Supreme Court held that an applicant for an absentee ballot must sign the application form himself or herself, and that an application that is signed by a representative of the applicant is invalid. Additionally, in Taylor v. Cox, the Alabama Supreme Court noted that § 17-10-4, Ala. Code 1975, makes no exception or accommodation for a person physically incapable of making his or her own signature, and suggested that the Legislature reconsider the wording of the statute.
Although the record indicates that Evans informed Rosia and Sharon that Sharon could sign Rosia's name, testimony did not indicate that Evans acted willfully. "A `willful' act may be described as one `done *Page 424 
intentionally, knowingly, and purposely, without justifiable excuse, as distinguished from an act done carelessly, thoughtlessly, heedlessly or inadvertently.'" Padgett v. State, 36 Ala. App. 355, 357, 56 So.2d 116
(1952) (holding that, while registering to vote, a defendant who falsely replied that he had never been convicted of a crime did so as the result of inadvertence or ignorance and his action did not constitute a willful act of perjury). In Parker v. Sutton, 47 Ala. App. 352 (Ala.Civ.App. 1971), the Alabama Appellate Court stated:
 "The connotation of the word `willful' . . . as it appears almost invariably in legal phraseology is one of premeditated wrong, an act done with evil intent or bad motive or purpose, unlawful, and without legal justification. It implies not only the voluntary and intentional doing of an act, but also intending the result which follows from the doing of the act."
47 Ala. App. at 359.
Given that Sharon testified that her mother told her that she was not feeling well and asked her to sign the application, and that testimony did not indicate that Evans willfully changed or falsified Rosia's absentee ballot application, or that he otherwise promoted illegal absentee voting, the state failed to establish a prima facie case of illegal absentee voting regarding Rosia's application.
Additionally, we must determine whether the state established a prima facie case of second-degree criminal possession of a forged instrument.
Section 13A-9-6, Ala. Code 1975, states, in pertinent part:
 "(a) A person commits the crime of criminal possession of a forged instrument in the second degree if he possesses or utters any forged instrument of a kind specified in Section 13A-9-3
with knowledge that it is forged and with intent to defraud."
As previously stated, § 13A-9-3, Ala. Code 1975, forgery in the second degree, requires that a person, with the intent to defraud, falsely make, complete, or alter a written instrument.
In Jones v. State, 372 So.2d 892 (Ala.Crim.App. 1979), this Court stated:
 "`"Forgery is not established by the bare fact that one man has signed the name of another to a writing having apparent legal significance because the signing (1) may have been authorized, in which case the writing is not false, or (2) though unauthorized may have been in the bona fide belief in the existence of such authority, in which case, although the writing is actually false, it was prepared without intent to defraud." Perkins[, Criminal Law 341,] 352 [(2d ed. 1969)].'"
372 So.2d at 896, quoting Finney v. State, 348 So.2d 876 (Ala.Crim.App. 1977). (Emphasis added.)
In this case, both Rosia and Sharon testified that Rosia gave Sharon permission to sign the absentee ballot application. Sharon testified that she signed her mother's name on the application and that she may have written her mother's birthdate on the application, and Dr. Roper testified that all three handwritten entries on the application were made by the same person. Dr. Roper did not identify Evans as the person who entered the information on the application. Thus, the evidence did not establish that the application was false, as required by § 13A-9-3
and § 13A-9-6, Ala. Code 1975. Given that the writing on the application was not falsely made, the evidence was insufficient to establish that Evans had knowledge that the application was forged, that he intended to defraud, and that he falsely made, completed, or *Page 425 
altered the application. Based on the foregoing, we conclude that the state also did not establish a prima facie case of second-degree criminal possession of a forged instrument as to Rosia Gray.
 B. Annie Ward and Sophia Ward
Evans was convicted of illegal absentee voting regarding the absentee ballot application of Annie Ward (Counts 6, 7, 8 in CC-96-58), illegal absentee voting regarding the absentee ballot application of Sophia Ward (Counts 9, 10, 11 in CC-96-58), and second-degree forgery of Sophia Ward's application (Count 12 in CC- 96-58).
Annie Ward testified that, in February 1995, Evans visited her and her sister at her sister's house. Ward stated that Evans told her that he had some papers for her to sign. According to Ward, Evans told her to fill out a form for herself and one for each of her children, including Sophia. Ward testified that, because she was not wearing her glasses, Evans filled out the information on the application forms for her. Ward stated that Evans told her that she should write her signature on her application and that she should sign for her children on their applications. Ward indicated that Evans told her that it was an acceptable practice to sign for one's children on their absentee ballot application forms. Additionally, Ward stated that she did not authorize Evans to check a box on the application indicating that she would be out of town on election day. (R. 500.) Ward testified that she planned to vote at the polls on election day, and that she thought the absentee ballot application was a new procedure for voting. Ward further testified that, because Evans was a police officer, she believed him and thought that, even though she would be in town on election day and able to vote, applying for an absentee ballot and signing her children's signatures was not wrong.
Dr. Richard Roper, a forensic handwriting expert, testified that, in his opinion, the information on Ward and Sophia's absentee ballot applications was written by Evans. Roper stated that it appeared that the signatures of Annie and Sophia Ward were not written by Evans. Additionally, Roper stated that, in his opinion, the return address and the mailing address on the envelope that was used to send in the application were written by Evans.
Given that Ward testified that she did not authorize Evans to check the box on her application indicating that she would be out of town on election day, the evidence was sufficient to establish that Evans willfully falsified Ward's application. Thus, the state established one count of illegal absentee voting regarding Ward's application.
Additionally, in this case, Ward testified that Evans approached her with the absentee ballot applications and instructed her to fill out the applications for herself and her children. Ward stated that Evans assisted her in filling out the applications for her children and instructed her to sign the documents. Therefore, because the evidence established that Evans willfully aided Ward in filling out Sophia's ballot application and that he solicited and encouraged illegal absentee voting, the state established a prima facie case of illegal absentee voting.
Furthermore, when viewing the evidence in the light most favorable to the state, the evidence established a prima facie case of second-degree forgery. In this case, Ward testified that, after Evans told her that it was an acceptable practice to sign an absentee ballot for a child, she signed Sophia's name to the application. Thus, the state established that Evans, *Page 426 
with the intent to defraud, assisted Ward by falsely making, completing, or altering Sophia's absentee ballot application.
 C. Charlie Fowler
Evans was convicted of illegal absentee voting (Counts 15, 16, 18, 19 in CC-96-58), and second-degree forgery of an affidavit (Count 20 in CC-96-58).
Charlie Fowler testified that, in February 1995, Evans approached him and told him that "he took care of it." (R. 752.) Fowler stated that he assumed the comment was in reference to absentee voting. Testimony indicated that an absentee ballot application and an affidavit envelope for Fowler were sent to Townsend's office. Fowler stated that he did not sign the application or the affidavit, and that he did not give anyone permission to complete or to sign the application or affidavit for him. Fowler also stated that his name was spelled incorrectly on the voting documents.
Dr. Roper stated that, in his opinion, the information and the "Charlie Fowler" signatures on the absentee ballot application were written by Evans. Additionally, Dr. Roper stated that, in his opinion, the information and the signature of the second witness (signed as "Aaron Evans") on the affidavit were written by Evans. Dr. Roper indicated that he was unable to determine the writer of the "Charlie Fowler" signature on the affidavit.
Given that Evans stated that he did not sign an absentee ballot application, and that Dr. Roper stated that, in his opinion, the signatures on the absentee ballot application were written by Evans, the state's evidence established that Evans willfully falsified Charlie Fowler's absentee ballot application. Thus, a prima facie case of illegal absentee voting was established.
Furthermore, given that Fowler testified that he did not authorize Evans to fill out a ballot affidavit for him, and that Dr. Roper testified that, in his opinion, the voter information on the affidavit was written by Evans, the evidence established that Evans, with the intent to defraud, falsely made or completed Charlie Fowler's ballot affidavit. Thus, the state established a prima facie case of second-degree forgery.
 D. Charles O. White
Evans was convicted of illegal absentee voting (Counts 22, 23, 25, 26 in CC-96-58) and second-degree forgery of an affidavit (Count 27 in CC-96-58).
Charles White testified that, at some point before the election in February 1995, Evans brought a voter registration card to his house and asked him to sign the card. White stated that he signed the card, and that Evans mentioned something about an absentee ballot. Testimony indicated that an application for an absentee ballot for a "Charles White" was sent to Townsend's office. White testified that he did not sign an application for an absentee ballot and he did not give anyone permission to fill out the application. Additionally, testimony indicated that an absentee ballot envelope, a ballot, and an affidavit for a "Charles White" were sent to Townsend's office. White testified that he did sign the affidavit, but that he did not fill out the information on the absentee ballot envelope or on the ballot.
Dr. Roper testified that, in his opinion, the voter information and the signatures on the ballot affidavit were written by Evans. Additionally, Dr. Roper stated that, in his opinion, the information on the ballot envelope and the signature of the second signature (signed as "Aaron Evans") was written by Evans. Dr. Roper indicated that he could not conclusively *Page 427 
identify who wrote the voter signature on the absentee ballot envelope.
Given that White testified that he did not fill out or sign an absentee ballot application and that Dr. Roper testified that, in his opinion, the information and signatures on the application appeared to have been written by Evans, the evidence was sufficient to establish that Evans willfully falsified an absentee ballot application. Thus, the state established a prima facie case of illegal absentee voting.
Furthermore, when viewing the evidence in the light most favorable to the state, as we are required to do, Bozeman v. State, supra, we conclude that the state established a prima facie case of second-degree forgery. In this case, White testified that he did not complete the information on the affidavit. Dr. Roper testified that, in his opinion, the voter information on the affidavit and the second witness's signature (signed in the name of "Aaron Evans") were written by Evans. Thus, the evidence sufficiently established that Evans, with the intent to defraud, falsely made or completed Charles White's affidavit.
 E. Ronnie Hedgeman
Evans was convicted of illegal absentee voting (Counts 1, 2, 7, 8 in CC-96-60), second-degree forgery of Ronnie Hedgeman's absentee ballot application (Count 3 in CC-96-60), and second-degree forgery of an affidavit (Count 4 in CC-96-60).
Ronnie Hedgeman testified that, in February 1995, Evans visited him at his uncle's residence. Hedgeman stated that Evans asked him to sign some papers and asked him for his Social Security number and date of birth. According to Hedgeman, even though he did not know what kind of document he was signing, he signed the papers and gave them back to Evans. Testimony indicated that an absentee ballot application and an affidavit envelope containing a ballot from Hedgeman were sent to Townsend's office. Hedgeman testified that he did not give anyone permission to fill out an absentee ballot application or an affidavit for him, and that the signatures and the information on these documents were not written by him.
Dr. Roper testified that the "Ronnie Hedgeman" signature on the application appeared to have been traced over from another signature. Dr. Roper stated that, in his opinion, the signatures and information on the application were made by Evans. Additionally, Dr. Roper stated that, in his opinion, the second witness's signature (signed as "Aaron Evans") and the return address on the affidavit envelope were written by Evans. According to Dr. Roper, the voter signature on the affidavit may have been written by Evans.
Given that Hedgeman testified that he did not fill out information on the affidavit, that testimony indicated that the affidavit and ballot were sent to Townsend's office, and that Dr. Roper testified that, in his opinion, the return address on the affidavit envelope was written by Evans, the evidence was sufficient to establish that Evans promoted illegal absentee voting. Thus, the state established a prima facie case of illegal absentee voting.
Additionally, when viewing the evidence in the light most favorable to the state, we conclude that the state established two counts of second-degree forgery. In this case, Hedgeman testified that the information and signatures on the ballot application and affidavit were not written by him. Dr. Roper testified that, in his opinion, the signatures and information on the application were written by Evans, and that the voter signature appeared *Page 428 
to have been traced from another document. Furthermore, Dr. Roper stated that, in his opinion, the voter signature on the affidavit may have been written by Evans. Thus, sufficient evidence was presented from which the jury could conclude that Evans falsely made, completed, or altered both the absentee ballot application and the affidavit.
 F. Floyd Herrod
Evans was convicted of illegal absentee voting (Counts 1, 2, 3, 4 in CC-96-61), of second-degree forgery of Floyd Herrod's absentee ballot application (Count 5 in CC-96-61), and of second-degree forgery of an affidavit (Count 6 in CC-96-61).
Herrod testified that, at some point before the election, Evans brought some papers, including an absentee ballot, to his house and talked to him about the election. Herrod gave conflicting testimony concerning their conversation. Herrod first testified that Evans threatened that, if he did not vote, Evans would arrest him. Later in his testimony, Herrod stated that Evans had not threatened to arrest him. Additionally, Herrod indicated that Evans left his house with the voting documents. Testimony indicated that an application for an absentee ballot and an affidavit envelope from Herrod were sent to Townsend's office. Herrod testified that he did not give anyone permission to fill out a ballot affidavit or an application for him, and that he did not sign the voting documents.[3]
Dr. Roper testified that, in his opinion, the voter information on the absentee ballot application was written by Evans. The record indicates that Evans signed his own name as a witness on the absentee ballot application. Dr. Roper stated that, in his opinion, the second witness's signature, signed as a name other than Evans's, and the return address on the affidavit envelope were written by Evans. Dr. Roper indicated that, in his opinion, the first witness's signature, "Ollie Evans," on the affidavit was not written by Evans.
Given that Herrod testified that he did not give anyone permission to fill out an absentee ballot application or an affidavit for him and that he did not authorize anyone to sign for him, and given further that Dr. Roper testified that, in his opinion, the information on the application and the affidavit was written by Evans, the evidence established that Evans falsely completed the application and affidavit. Thus, the state established two counts of second-degree forgery.
The evidence also established a prima facie case of illegal absentee voting. In this case, Herrod testified that Evans brought "voting papers" to his house, and that he tried to encourage him to sign the papers. Herrod testified that he did not sign the absentee ballot application or the affidavit, and that he did not give anyone permission to complete a ballot on his behalf. Testimony indicated that an affidavit envelope and a ballot showing Herrod as an absentee voter were sent to Townsend's office. Dr. Roper testified that, in his opinion, the return address on the affidavit envelope was written by Evans. Thus, when viewing the evidence in the light most favorable to the state, the evidence established a prima facie case that Evans promoted illegal absentee voting.
Accordingly, the trial court did not err in denying the motion for a judgment of acquittal on the ground that the state failed to establish a prima facie case. The *Page 429 
resolution of conflicting evidence is a jury determination. SeeWilder v. State, 401 So.2d 151, 162 (Ala.Crim.App. 1981) (in a similar case involving numerous voting violations, this Court stated that "only a jury could unscramble the hodge-podge of the testimony").
 G.
Additionally, Evans appears to argue that the evidence of forgery counts as to all victims was insufficient because, he claims, the absentee election manager was not a "public employee" as defined by § 32-25-1(9), Ala. Code 1975.
The Code of Ethics for Public Officials and Employees is contained in §§ 36-25-1 through 36-25-30, Ala. Code 1975. Section 32-25-1, Ala. Code 1975, defines the term "public employee" as used within the Code of Ethics: "Any person employed at the state, county or municipal legel of government or their instrumentalities who is paid in whole or in part from state, county, or municipal funds." See § 36-25-1, Ala. Code 1975 ("Whenever used in this chapter, the following words and terms shall have the following meanings. . . .). (Emphasis added.) The offense of forgery is defined in the Criminal Code. See § 13A-9-4, Ala. Code 1975. The Criminal Code does not specifically define the terms "public office," "public employee," and "public official."
In Ex parte T.B., 698 So.2d 127 (Ala. 1997), the Alabama Supreme Court stated:
 "When the language of a statute is plain and unambiguous, as in this case, courts must enforce the statute as written by giving the words of the statute their ordinary meaning — they must interpret that language to mean exactly what it says and thus give effect to the apparent intent of the Legislature. "
698 So.2d at 130.
In this case, Carol Townsend testified that, in 1995, she was the city clerk. Townsend stated that she was appointed by the city council, and that part of her duties as a city clerk was to act as election manager and absentee election manager for municipal elections. Townsend served in a position where she acted on behalf of the city government to ensure the integrity of a public election. Thus, for purposes of the forgery statute, § 13A-9-4, Ala. Code 1975, the record indicates that Townsend served in a public office as a public official or employee whose job it was to receive absentee applications and ballots. Based on the foregoing, we conclude that the trial court did not err in denying the motion for a judgment of acquittal on the ground that Townsend was not a "public employee."
 H.
Evans also argues that the evidence of illegal absentee voting was insufficient because, he claims, there was no evidence that the votes were cast or counted.
As previously addressed, when the language of a statute is plain and unambiguous, the courts must enforce the statute as written, giving the words of the statute their ordinary meaning. See Ex parte T.B., supra.
According to § 17-10-17, Ala. Code 1975, illegal absentee voting may be committed by any of the following:
1. Willfully changing an absentee voter's ballot;
 2. Willfully voting more than once by absentee in the same election;
3. Willfully voting for another voter;
 4. Falsifying an absentee ballot or verification so as to vote absentee;
5. Soliciting illegal absentee voting;
6. Encouraging illegal absentee voting;
7. Urging illegal absentee voting; *Page 430 
8. Otherwise promoting illegal absentee voting;
9. Aiding any person unlawfully to vote absentee;
10. Knowingly and unlawfully voting absentee; and
 11. Voting both as an absentee voter and voting a regular ballot during the same election.
Section 17-10-17 encompasses actually voting illegally, preparing to vote illegally, or soliciting, encouraging, urging, or otherwise promoting illegal absentee voting. Thus, the statute does not limit the offense to those circumstances where an illegal absentee ballot is actually cast and counted.
Given that, as previously discussed, the evidence established prima facie cases of Evans's falsification, assistance, aid, encouragement, and/or solicitation of the illegal absentee voting, the trial court did not err in denying the motion for a judgment of acquittal as to the illegal absentee voting counts on the ground that those votes were not cast and counted.
 II.
Evans contends that the trial court erred in failing to grant his motion for a mistrial and his motion to dismiss the indictments on the ground that they were multiplicitous. (Issue I in Evans's brief to this Court at p. 6.) Specifically, he appears to argue that the various charges of illegal absentee voting should not have been listed as separate counts within each indictment.
The concept of multiplicity is discussed in 2 LaFave Israel,Criminal Procedure, § 19.2(e) (1984):
 "A multiplicitous indictment charges a single offense in several counts. It is often the product of a prosecutor's mistaken assumption that a particular statute creates several separate offenses rather than a single crime that can be accomplished through multiple means. A multiplicity issue is also presented when a series of repeated acts are charged as separate crimes but the defendant claims they are part of a continuous transaction and therefore a single crime. The principal danger in multiplicity is that the defendant will receive multiple sentences for a single offense, although courts have noted that multiple counts may also work against the defendant by leading the jury to believe that the defendant's conduct is especially serious because it constitutes more than one crime. Multiplicity does not require dismissal of the indictment. The court may respond to a successful objection by requiring the prosecutor to elect one count, consolidating the various counts, or simply advising the jury that only one offense is charged."
(Emphasis added.)
In Dill v. State, 723 So.2d 787 (Ala.Crim.App. 1998), this Court stated:
 "An indictment is multiplicitous if a single offense is charged in more than one count, thereby possibly prejudicing the defendant by suggesting that more than one offense had been committed."
723 So.2d at 808.
The record indicates that, before the jury was charged, the trial court consolidated the multiple counts of illegal absentee voting as to each victim. For instance, the multiple counts of illegal absentee voting involving Rosia Gray were read to the jury in the court's instructions as though charging a single offense. (R. 1145-46.) The trial court's instructions were further clarified by the verdict forms, which also consolidated the counts. Additionally, Evans was convicted of only one count of illegal absentee voting as to each victim. *Page 431 
Given that the trial court consolidated the separate counts of illegal absentee voting as to each victim, there was no suggestion that more than one offense of illegal absentee was committed against each victim. Thus, the trial court did not err in denying the motion for a mistrial and the motion to dismiss on the ground that the counts alleging illegal absentee voting were multiplicitous.
 III.
Evans maintains that he should not have been charged and convicted of both illegal absentee voting and second-degree forgery. (Part II of Evans's brief to this Court at p. 8.) Specifically, he appears to argue that second-degree forgery is encompassed within the elements of illegal absentee voting.
We question whether Evans preserved this issue for review. "Specific grounds of objection waive all other grounds not specified at trial."Smith v. State, 602 So.2d 470, 472 (Ala.Crim.App. 1992). In this case, the defense objected on the specific grounds of multiplicity in regard to the various counts of illegal absentee voting, and the trial court overruled that objection; this specific issue — whether second-degree forgery is included within the elements of illegal absentee voting — raised on appeal, however, does not appear to have been presented to the trial court.
Nevertheless, we find that in this case the forgery counts are distinctly separate from the illegal-absentee-voting counts. As previously addressed in Part I of this opinion, the evidence was sufficient to establish the separate acts of forgery and illegal absentee voting. Thus, the trial court did not err in determining that Evans was appropriately charged with both illegal absentee voting and second-degree forgery.
 IV.
Evans maintains that the trial court should have granted his motion for a mistrial because, he says, the prosecutor engaged in misconduct. Specifically, he appears to argue that the prosecutor should not have charged Evans with multiple counts of illegal absentee voting and forgery. Additionally, he claims that the prosecutor should not have remarked during opening argument that Evans committed the offenses in order to gain an appointment as the chief of police. Evans also argues that the prosecutor engaged in misconduct when, he says, the prosecutor asked leading questions of an illiterate witness during direct examination.
"[T]he grant or denial of a mistrial is a matter within the sound discretion of the trial court and will only be disturbed upon a showing of manifest abuse." Durden v. State, 394 So.2d 967, 972 (Ala.Crim.App. 1980), cert. denied, 394 So.2d 977 (Ala. 1981).
 A.
Evans argues that the prosecutor should not have charged him with multiple counts of illegal absentee voting and forgery.
As previously addressed in Parts II and III of this opinion, any error in charging Evans with multiple counts was cured by the trial court's consolidation of the counts. Thus, we do not find that the trial court manifestly abused its discretion in denying Evans's motion for a mistrial on this ground.
 B.
Evans argues that the prosecutor should not have made a remark during opening argument that Evans committed the offenses in order to gain an appointment as the chief of police. *Page 432 
Our review of the record indicates that Evans did not preserve this issue for review. The record indicates that defense counsel did not object during opening arguments, and that he initially raised this issue to the trial court in his motion to dismiss and motion for a mistrial on the grounds of improper comments of the prosecution at the close of the state's case.
"`[I]t was incumbent on the appellant to object to any improper conduct when first discovered.'" Ray v. State, 527 So.2d 166, 168 n. 2 (Ala.Crim.App. 1987), quoting Woodyard v. State, 428 So.2d 136, 137
(Ala.Crim.App. 1982). Only matters timely raised at trial are preserved for appellate review. See Harrell v. State, 608 So.2d 434 (Ala.Crim.App. 1992). Because the record does not indicate that Evans timely objected to the comment as soon as the objectionable ground became apparent, the issue is not preserved. Moreover, the opening argument of the prosecutor is not contained in the record. "A reviewing court cannot predicate error on matters not shown by the record." Gibson v. State, 555 So.2d 784,791 (Ala.Crim.App. 1989), citing Robinson v. State, 444 So.2d 884, 885
(Ala. 1983).
Even had Evans preserved this issue for appellate review, the trial court did not abuse its discretion in denying the motion to dismiss and the motion for a mistrial.
In Webb v. State, 696 So.2d 295 (Ala.Crim.App. 1996), this Court stated:
 "`In reviewing allegedly improper prosecutorial argument, we must first determine if the argument was, in fact, improper. When a prosecutor engages in conduct that deprives the defendant of a fair trial, due process is violated. Darden v. Wainwright, 477 U.S. 168, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986). Improper prosecutorial argument is reviewed in the context of the entire trial. United States v. Boyce, 797 F.2d 691 (8th Cir. 1986). Prosecutorial misconduct is subject to a harmless error analysis. United States v. Martin, 815 F.2d 818 (1st Cir.), cert. denied, 484 U.S. 825, 108 S.Ct. 89, 98 L.Ed.2d 51 (1987); United States v. Boyce; Oliver v. Wainwright, 795 F.2d 1524 (11th Cir. 1986), cert. denied, 480 U.S. 921, 107 S.Ct. 1380, 94 L.Ed.2d 694
(1987).'"
696 So.2d at 299, quoting Smith v. State, 698 So.2d 189 (Ala.Crim.App. 1996). "`The relevant question is whether the prosecutors' comments "so infected the trial with unfairness as to make the resulting conviction a denial of due process" Donnelly v. DeChristoforo, 416 U.S. 637,94 S.Ct. 1868, 40 L.Ed.2d 431 (1974).'" Webb, 696 So.2d at 299, quoting Darden v.Wainwright, 477 U.S. 168, 181, 106 S.Ct. 2464, 2471, 91 L.Ed.2d 144, 157
(1986).
In this case, after the defense made a motion to dismiss and a motion for a mistrial, the trial court determined the following:
 "[I]f you will submit to me an instruction with regard to a comment, [I] will instruct the jury with regard to that comment. I don't consider the comment to be inflammatory in nature. In fact, my recollection of the comment was that it was a separate motive that drove Mr. Evans to allegedly commit these particular offenses. And based upon that motive, I think [the prosecutor] concluded that it may have something to do with his want to become police chief or some other Greensboro public official. So the motion for mistrial will also be denied."
(R. 1035-36.)
The record indicates that, before opening arguments, the trial court instructed the jury that it was to base its verdict on the evidence in the case, and that the *Page 433 
arguments of the attorneys were not evidence.
Given that the record indicates that the prosecutor's comment that Evans hoped to become the chief of police was made during opening argument, and that the trial court instructed the jury that the argument of the attorneys is not evidence, Evans failed to establish that the comment "so infected the trial with unfairness as to make the resulting conviction a denial of due process." Darden v. Wainwright, supra. Furthermore, the record indicates that the defense did not submit a written instruction regarding the comment, as the trial court requested it to do. We cannot predicate error when the trial court provided the defense with an adequate remedy. Thus, the trial court did not manifestly abuse its discretion in denying the motion to dismiss and the motion for a mistrial.
 C.
Evans also argues that the prosecutor engaged in misconduct because, he says, the prosecutor asked leading questions of an allegedly illiterate witness during direct examination. Essentially, he appears to argue that the trial court erred in permitting the prosecutor to ask leading questions during direct examination of a witness for the state.
Rule 611, Ala.R.Evid., states, in pertinent part, "Leading questions should not be used on direct examination of a witness, except when justice requires they be allowed." Generally, "a question to a witness which assumes the existence of a material fact, to which the witness has not testified, is improper." C. Gamble, McElroy's Alabama Evidence, § 121.06 (5th ed. 1996), citing Tomlin v. State, 591 So.2d 550, 558
(Ala.Crim.App. 1991).
"[I]t has been said that there is no form of question which may not be leading and that the trial court should look beyond the form to the substance and the effect of the inquiry in the particular circumstances of the case." C. Gamble, McElroy's Alabama Evidence, § 121.05(3) (5th ed. 1996). "Thus, leading questions may be allowed, depending on the circumstances of the particular case." Williams v. State,568 So.2d 354, 357 (Ala.Crim.App. 1990). "`Whether to allow or disallow leading questions is discretionary with the trial court and except for a flagrant violation will there be reversible error.'" Seagroves v. State,726 So.2d 738, 744 (Ala.Crim.App. 1998), quoting Ruffin v. State,582 So.2d 1159, 1162 (Ala.Crim.App. 1991); DeBruce v. State, 651 So.2d 599,606 (Ala.Crim.App. 1993).
Our review of the record indicates that, initially, the prosecutor asked the witness several open-ended questions. Shortly into the examination, the prosecutor asked the witness to speak more slowly when answering his questions. The prosecutor then informed the trial court that the witness was unable to read and write, and he requested that he be permitted to ask the witness leading questions. The trial court gave the prosecution "some latitude" in questioning the witness. (R. 448.) Our review of the record indicates that, although the prosecutor's questions were in the form of leading questions, the questions did not substantially assume material facts. After the direct examination, the defense was given an opportunity to cross-examine the witness and to clarify any inconsistencies in his testimony.
Given that the trial court was able to hear and to view the witness's demeanor, that the prosecutor requested that the witness speak more slowly, and that our review of the record indicates that the prosecutor did not ask substantially misleading questions, the trial court did not err in permitting the prosecutor to ask leading *Page 434 
questions. Thus, the trial court did not manifestly abuse its discretion in denying the motion for a mistrial on the grounds of prosecutorial misconduct.
 V.
Evans contends that Section 5 of the Civil Rights Act of 1965 requires the dismissal of charges against him. (Issue IV in Evans's brief to this Court at p. 9.) Specifically, he argues that the absentee election manager for the City of Greensboro "instituted a serious and material change in the procedure" for absentee voting without first obtaining clearance from the United States Justice Department. (Evans's brief to this Court at p. 9.)
Our review of the record indicates that Section 5 of the Civil Rights Act of 1965 is not relevant to Evans's case. Evans was charged with illegal absentee voting, second-degree forgery, and possession of a forged instrument. Evans's case is not an action to enforce election procedures, to work a change in the election laws, or even to contest an election.
Given that determining whether Evans committed forgery, engaged in illegal absentee voting, or possessed a forged instrument does not involve the question whether a change in voting procedures violated Section 5 of the Civil Rights Act of 1965, Evans's contention is not material in this proceeding. Furthermore, Evans cites no authority holding that, under the Civil Rights Act, a criminal prosecution for violating an election law because some person, other than the defendant, instituted a new procedure to secure evidence against Evans is prohibited.
 VI.
Evans appears to contend that the state should have been required to elect from among the separate counts of illegal absentee voting charged in the indictment with regard to each victim. Specifically, he argues that he "was charged with crimes under the same statute with a varying manner (degree) of proof." (Part V of Evans's brief to this Court at p. 10.)
As previously addressed in Part II of this opinion, given that the trial court consolidated the separate counts of illegal absentee voting as to each victim, there was no suggestion that more than one offense of illegal absentee was committed against each victim. See Watkins v.State, 36 Ala. App. 711, 63 So.2d 263, 264 (1953) ("The doctrine of election operates to protect a defendant from being prosecuted for more than one offense in the same count or an indictment"). Cf. Ex parteMadison, 718 So.2d 104 (Ala. 1998). Thus, the trial court did not err in not requiring the state to elect between the separate counts; however, even had error occurred, it was cured by the trial court's consolidating the separate counts of illegal absentee voting.
 VII.
Evans argues that the process for absentee voting is one act. Specifically, he appears to argue that he should not have been charged and convicted of both second-degree forgery and illegal absentee voting. (Part VI in Evans's brief to this Court at p. 10-11.)
As previously discussed in Part I, the evidence sufficiently established separate acts of second-degree forgery and illegal absentee voting. Thus, the trial court did not err in charging the jury on both second-degree forgery and illegal absentee voting.
 VIII. IX.
Evans appears to argue that under the facts of his case, he cannot be guilty of the offense of second-degree forgery. (Parts VII and VIII in Evans's *Page 435 
brief to this Court at p. 11.) Specifically, he seems to allege that the second-degree forgery statute is a statute addressed solely to commercial transactions and that the state failed to establish that the acts of forgery in his case were committed for pecuniary gain.
An element of second-degree forgery is an "intent to defraud." Section13A-9-3(a), Ala. Code 1975. "Intent to defraud" is defined as including "a purpose to injure another person's interest which has value." §13A-8-1(14), Ala. Code 1975. The right to vote is a valuable legal right. See Presley v. Etowah County Comm'n, 502 U.S. 491, 505,112 S.Ct. 820, 117 L.Ed.2d 51 (1992) ("A vote for an ill-funded official is less valuable than a vote for a well-funded one."). Additionally, the commentary to § 13A-9-4, Ala. Code 1975, notes:
 "Forgery in the first, second and third degree retain the intent to defraud, defined in § 13A-9-1(8) as `a purpose to use deception, as defined in § 13-8-1(1), or to injure another person's interest which has value, as defined in § 13A-8-1(14).' The provision covers situations where the forger himself defrauds the victim or aids and abets the acts of others. This intent requirement necessitates a pecuniary significance, or other value, and substantially follows Alabama law."
(Emphasis added.) See Warren v. State, 32 Ala. App. 302, 25 So.2d 695
(1946); DeGraffenreid v. State, 28 Ala. App. 291, 182 So. 492 (1938) (divorce decree, which was the subject of a third-degree forgery conviction, had no pecuniary value); Dudley v. State, 10 Ala. App. 130,64 So. 534, cert. denied, 188 Ala. 77, 66 So. 91 (1914) (application for life insurance, which was the subject of a third-degree forgery conviction, had no pecuniary value).
Given that voting is a valuable right of every citizen, the trial court did not err in determining that the forgery statutes were applicable in Evans's case.
 X.
Evans maintains that the applications, affidavits, and ballots should have been suppressed. He argues that, because there was no testimony from the chief inspector for each poll site identifying and authenticating the voting materials, a foundation for the admissibility of the voting materials was not established. Specifically, he argues:
 "A very crucial element lacking was the testimony from the election officials at the absentee polling site, like the chief inspector, to verify that the documents actually were received and not altered. . . . Documents had been opened altered, stapled, taped, etc., and we have no way of knowing if the documents were properly placed together and no way of knowing if a vote was ever cast."
(Evans's brief to this Court at p. 13.)
 A.
Evans argues that, because the chief inspectors for each poll site did not testify concerning the identification and authentication of the voting materials, the chain of custody of the voting materials was not established.
In Turner v. State, 610 So.2d 1198 (Ala.Crim.App. 1992), this Court addressed a challenge to the admissibility of the evidence when the state failed to offer testimony as to what happened to the evidence before the police took control of it, stating:
 "This court has established that the State `need only prove to a reasonable probability that the object is in the same condition as, and not substantially different from, its condition at the commencement of the chain.' Sommer v. State, 489 So.2d 643, 645
(Ala.Cr.App. 1986). Moreover, the `evidence need not negate *Page 436 
the most remote possibility of substitution, alteration, or tampering of the evidence.' Slaughter v. State, 411 So.2d 819, 822 (Ala.Cr.App. 1981). We conclude that the State established a proper chain of custody."
610 So.2d at 1200.
Our review of the record indicates that a foundation was established. Although an inspector for each poll site did not identify the voting materials, the testimony of Carol Townsend, the victims, Dr. Richard Roper, Perry Beasley (an agent for the Alabama Department of Public Safety Bureau of Investigation), and Steven Drexler (a document examiner for the the Alabama Department of Forensic Sciences) established a sufficient foundation for the admission of the voting materials. Thus, no reversible error occurred.
 B.
Evans argues that Townsend illegally seized the voting materials and that they should therefore have been excluded. He appears to claim that, because Townsend allegedly violated the law by keeping the voting materials in her possession, the exclusionary rule should apply.
In Smith v. State, 745 So.2d 922 (Ala.Crim.App. 1999), this Court addressed whether the exclusionary rule applies to property owned by a third person. We stated, in Smith:
 "`In order to raise a Fourth Amendment claim, a defendant must assert a property or possessory interest in the property searched or seized or must show such an interest as to give him a legitimate expectation of privacy in the area searched.' Rivers v. State, 666 So.2d 34, 35 (Ala.Cr.App. 1994). The appellant has failed to show any such interest in Davis's home or in the shotgun itself. Contrary to the appellant's assertion that `if the [shotgun] can be introduced, then it can be attacked' (appellant's brief at p. 16), the United States Supreme Court has stated that `[a] person who is aggrieved by an illegal search and seizure only through the introduction of damaging evidence secured by a search of a third person's premises or property has not had any of his Fourth Amendment rights infringed.' Rakas v. Illinois, 439 U.S. 128, 134, 99 S.Ct. 421, 425, 58 L.Ed.2d 387 (1978)."
745 So.2d at 931.
In this case, the testimony of the victims, the investigators, and election personnel indicated that several applications, affidavits, and ballots were sent to Townsend's office. No evidence was presented indicating that any of the voting materials belonged to Evans. Thus, Evans does not have standing to challenge the seizure of the voting materials.
 XI.
Evans contends that the statutory limitations period had expired before he was charged with illegal absentee voting. Specifically, he argues that, because the votes were never cast, the offenses at most were misdemeanors, that the statute of limitations for misdemeanor charges had expired, and that the charges should have therefore been dismissed.
As previously addressed in Part I(H) of this opinion, it was not necessary for the state to prove that the illegal votes were cast. Thus, the trial court did not err in refusing to dismiss the charges on this ground.
 XII.
Evans contends that he was denied due process because, he says, the trial court limited his direct examination of a defense witness. Additionally, he maintains that he was denied due process because, he *Page 437 
claims, the court would not permit him to present testimony concerning selective prosecution.
 A.
Evans contends that the trial court erred in limiting his direct examination of Jack Drake, an election law expert. Specifically, Evans argues that defense counsel should have been permitted to question Drake concerning the confusion on the part of government officials and the general public regarding the election laws at the time the alleged offenses occurred.
Rule 402, Ala.R.Evid., defines "relevant evidence" as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."
Rule 403, Ala.R.Evid., states:
 "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."
"`A witness, be he expert or lay, cannot give his opinion when such constitutes a legal conclusion or the application of a legal definition.' [Charles W.] Gamble, [McElroy's Alabama Evidence] § 128.07 [(4th ed. 1991)]." Wilkerson v. State, 686 So.2d 1266, 1278
(Ala.Crim.App. 1996).
In this case, the trial court limited direct examination of Drake to testimony concerning "what the process and procedure is" during elections. (R. 1108.) The record indicates that Drake testified as to the procedures used to conduct an election with absentee ballots, and testified to general inconsistencies in the application of certain election laws. The trial court did not permit Drake to testify concerning confusion over the application of the election laws.
Whether the application of the election laws was confusing to the public or to government officials has minimal relevance in Evans's case. The main issue in his case was whether Evans willfully falsified absentee ballots and forged documents — not whether the election officials misapplied laws. Moreover, testimony concerning the confusion over application of the laws could have potentially confused the jury. Furthermore, any confusion over the application of the election laws was a matter for the court to determine, and was not a matter to be presented to the jury. Thus, the trial court did not err in limiting the direct examination of Drake.
 B.
Evans argues that he was denied due process because, he says, the trial court did not permit him to present testimony concerning selective prosecution.
The record indicates that the trial court gave the defense three opportunities during pretrial hearings to produce evidence concerning selective prosecution; the defense did not produce any such evidence. Our review of the record indicates that, because the defense did not produce any facts to substantiate its allegation of selective prosecution, the trial court granted the state's motion in limine to prevent the defense from presenting testimony concerning selective prosecution based on race.
 "The appellant has provided no evidence that he was singled out for prosecution. There is no evidence that the appellant was denied his rights to due process or to a fair and impartial trial. Cf. Lofton v. State, 515 So.2d 137 (Ala.Cr.App. 1987) (defendant failed to prove that he was a victim of selective prosecution)." *Page 438 
Hodges v. State, 570 So.2d 1252, 1260 (Ala.Crim.App. 1989). Thus, the trial court did not err in not permitting the defense to present evidence at trial concerning selective prosecution.
 XIII.
Evans maintains that the trial court erred in denying his requested jury charges 2, 3, 5, 7, and 8.
"The refusal of a requested written instruction, although a correct statement of law, shall not be cause for reversal on appeal if it appears that the same rule of law was substantially and fairly given to the jury in the court's oral charge or in other charges given at the request of the parties." Rule 21.1, Ala.R.Crim.P. See also Weaver v.State, 682 So.2d 488, 491 (Ala.Crim.App.), cert. denied, 682 So.2d 493
(Ala. 1993).
As this Court stated in Donahoo v. State, 647 So.2d 24, 28
(Ala.Crim.App. 1994): "A reversal will not be predicated upon the refusal of a requested charge where the import and intent of the defendant's requested charge is covered in the charge given by the trial court, even though the actual language of the request was not embraced within the court's charge."
Evans requested that the trial court instruct the jury to "assume that each of the voters whose ballots a defendant handles was eligible to vote absentee." (Defense's Requested Instruction #3, C. 44.) Our review of the record indicates that the trial court gave a similar instruction that substantially tracked the language of § 17-10-3(a), Ala. Code 1975, and stated that any qualified electors who are unable to vote at the designated polling place are authorized to vote by absentee ballot, provided that certain requirements are met. Given that the trial court's instruction was a correct statement of the law addressing the eligibility to vote an absentee ballot, the trial court did not err in refusing Evans's requested jury charge.
Evans also requested that the trial court instruct the jury that an absentee voter has the right to seek assistance, and that a voter may permit someone else to mark his or her ballot. (Defense's requested instruction #2, C. 42.) Additionally, Evans requested that the trial court read a portion of § 17-10-4, Ala. Code 1975, to the jury. The record indicates that, although the trial court refused to give Evans's requested instruction regarding voting assistance, the trial court instructed the jury that any applicant for an absentee ballot may have assistance in filling out an application, and that, if a voter is physically incapacitated, the voter may have assistance in marking the ballot. The record also indicates that the instruction substantially covered the requested portion of § 17-10-4, Ala. Code 1975. Given that the trial court's instruction was a correct statement of law and that it substantially covered § 17-10-4, the trial court did not err in denying Evans's requested instructions concerning the assistance provided to a voter.
Evans also requested that the trial court instruct the jury "that where one creates or confirms another's impression which is false but honestly believes to be true, no deception occurs." (Defendant's requested jury instruction #5, C. 46.) Although the trial court denied Evans's requested charge, it instructed the jury on "willfulness." The trial court's instruction concerning willfulness was appropriate and substantially covered the meaning behind Evans's requested charge concerning deception.
Evans additionally requested that the trial court instruct the jury that, in *Page 439 
order to convict him, it must find that he willfully violated § 17-10-4, Ala. Code 1975. (Defense's requested instruction #7, C. 47.) The trial court refused the requested instruction. Section 17-10-4, Ala. Code 1975, addresses the proper procedure to follow when assisting a person in voting absentee. However, § 17-10-4 does not include the willfulness of a defendant's acts as an element. The trial court did, throughout its instructions, thoroughly address the requirement of willfulness for violating § 17-10-17, Ala. Code 1975. Because Evans's requested instruction concerning willfulness as an element of a violation of § 17-10-4, Ala. Code 1975, was not a correct statement of law, and because the trial court thoroughly addressed willfulness throughout its instructions, the trial court did not err in refusing to instruct on willfulness as an element within § 17-10-4.
Additionally, Evans contends that the trial court erred in not instructing the jury regarding the opening statements of counsel. Our review of the record indicates that, before opening arguments, the trial court instructed the jury that the arguments of counsel are not evidence. After the trial court charged the jury, trial counsel requested that the court give an instruction about opening statements. The trial court determined that an additional charge was not necessary, and it denied the request. Given that the trial court initially instructed the jury concerning the opening arguments of counsel, the trial court did not err in not giving an additional instruction in its charge to the jury regarding the purpose of opening arguments before deliberations. Jurors are presumed to follow the trial court's instructions. Taylor v. State,666 So.2d 36, 70 (Ala.Crim.App. 1994), aff'd, 666 So.2d 73 (Ala. 1995), cert. denied, 516 U.S. 1120, 116 S.Ct. 928, 133 L.Ed.2d 856 (1996).
Based on the foregoing, we conclude that the trial court did not err in denying Evans's requested jury instructions.
 XIV.
Evans contends that his sentences for the forgery convictions were excessive. He appears to argue that the offense of second-degree forgery is encompassed within the offense of illegal absentee voting; therefore, he argues, his maximum sentence for forgery should have been for no more than two years' imprisonment — — the maximum sentence for illegal absentee voting.
As previously addressed in Parts I, VIII, and IX of this opinion, the evidence established that the forgery offenses were separate from the illegal absentee voting offenses. Thus, the sentence of 10 years' imprisonment for each count of second-degree forgery was within the permissible range of punishment. See § 13A- 9-3 and § 13A-5-6, Ala. Code 1975. We will not review whether a sentence is excessive when it is within the statutory range of punishment. Cf. Sinkfield v. State,669 So.2d 1026, 1028 (Ala.Crim.App. 1995); Garner v. State, 606 So.2d 177,182 (Ala.Crim.App. 1992); Harris v. State, 500 So.2d 1292, 1296
(Ala.Crim.App. 1986).
 XV.
Evans maintains that the cumulative effect of the trial court's errors denied him a fair trial. (Part XVI in Evans's brief to this Court at p. 15.)
Other than determining that the evidence was insufficient to establish a prima facie case of illegal absentee voting and possession of a forged instrument in the counts concerning Rosia Gray, we find no error in the specific instances of misconduct alleged by Evans. *Page 440 
 "`Because we find no error in the specific instances alleged by the appellant, we find no cumulative error. "Where no single instance of alleged improper conduct constituted reversible error, we do not consider their cumulative effect to be any greater." (citations omitted).'"
Chandler v. State, 615 So.2d 100, 110 (Ala.Crim.App. 1992), cert. denied,615 So.2d 111 (Ala. 1993), quoting Fisher v. State, 587 So.2d 1027, 1039
(Ala.Crim.App.), cert. denied, 587 So.2d 1039 (Ala. 1991), cert. denied,503 U.S. 941, 112 S.Ct. 1486, 117 L.Ed.2d 628 (1992).
We reverse the convictions and sentences for illegal absentee voting regarding the absentee ballot application of Rosia Gray and for possession of a forged instrument as to Rosia Gray's absentee ballot application. The judgment of the trial court regarding the remaining convictions and sentences is affirmed.
AFFIRMED IN PART; REVERSED IN PART.
Long, P.J., and McMillan, Cobb, and Baschab, JJ., concur.
 APPENDIX.
CC-96-58:
Victim Conviction Counts
Rosia Gray Illegal Absentee Voting 1, 2, 3
Rosia Gray Second-degree Possession of 5 a Forged Instrument
Annie Ward Illegal Absentee Voting 6, 7, 8
Sophia Ward Illegal Absentee Voting 9, 10, 11
Sophia Ward Second-degree Forgery 12 (of application)
Charlie Fowler Illegal Absentee Voting 15, 16, 18, 19
Charlie Fowler Second-degree Forgery 20 (of affidavit)
Charles O. White Illegal Absentee Voting 22, 23, 25, 26
Charles O. White Second-degree Forgery 27 (of affidavit)
_________________________________________________________________
CC-96-60:
Ronnie Hedgeman Illegal Absentee Voting 1, 2, 7, 8
Ronnie Hedgeman Second-degree Forgery 3 (of application)
Ronnie Hedgeman Second-degree Forgery 4 (of affidavit) *Page 441 
CC-96-61:
Floyd Herrod Illegal Absentee Voting 1, 2, 3, 4
Floyd Herrod Second-degree Forgery 5 (of application)
Floyd Herrod Second-degree Forgery 6 (of affidavit)
(Counts 4, 13, and 14 in CC-96-58 and counts 5 and 6 in CC-96-60 were dismissed before the case was submitted to the jury.)
[1] See Appendix.
[2] Even though testimony indicated that Evans told Sharon that it was acceptable to sign the application for her mother, no testimony indicates that he told Sharon to complete the application.
[3] The record indicates that the voter's signature line on the witness's absentee voting application and the affidavit are not signed, but that the signature line is marked with an "X." (C. 398-99.)